NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES, INC.
*vs.* CENTRAL BROADCASTING CORPORATION.

Hampshire.  October 5, 1979. — November 13, 1979.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, WILKINS, & LIACOS, JJ.

*Libel and Slander. Constitutional Law,* Freedom of speech and press, Libel and slander. *Practice, Civil,* Appeal, Summary judgment.

In an action by a labor union engaged in collective bargaining with the selectmen of a town on behalf of its policemen against a radio station for libel during a telephone talk show conducted by its employee in which a selectman, opposed to the approval and funding of the executed bargaining contract between the union and the town at an impending special town meeting, called and expressed an opinion embodied in the word "communism" which could carry a libelous meaning or connotation, it was error to deny the defendant's motion for summary judgment, since it appeared that there was no genuine issue for trial inasmuch as the facts on which the opinion was based were apparent and disclosed and were truly stated or referred to [220-228]; that the radio audience could take a charge of "communism" as mere pejorative rhetoric, a word too vague to be the subject of a defamation action [228-230]; and that on the part of the defendant there was no knowing falsehood or reckless indifference to falsity sufficient to sustain an action affecting freedom of expression [230].

CIVIL ACTION commenced in the Superior Court on September 2, 1977.

A motion for summary judgment was heard by *Moran, J.*, a Distirct Court judge sitting under statutory authority.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Evan T. Lawson (Howard J. Wayne* with him) for the defendant.

*Robert H. Goldman (Michael D. Quinlan* with him) for the plaintiff.

KAPLAN, J. National Association of Government Employees, Inc., is a labor union in the form of a nonprofit Delaware corporation, having a division known as the International Brotherhood of Police Officers with a Local No. 398 in the small town of Ware.[1] The union complained in Superior Court of an alleged libel — a charge of "communism" — made by or on behalf of the defendant Central Broadcasting Corporation, owner of radio station WARE, in the course of a talk show on February 17, 1977, conducted by Jacquelyne Murphy, an employee of the station. After the pleadings were completed by answer to an amended complaint, the defendant moved for summary judgment under Mass. R. Civ. P. 56, 365 Mass. 824 (1974), tendering the pleadings, the plaintiff's responses to the defendant's request for admissions, and affidavits of Murphy and Richard H. Vaughan, executive vice president of the defendant. On its part the plaintiff filed an affidavit of William G. Norton, then executive director of the International Brotherhood. A judge of the District Court serving by designation in the Superior Court denied the motion without opinion. The defendant applied to a single justice of the Appeals Court under G. L. c. 231, § 118, first paragraph, for relief from the order of denial, and the single justice granted relief by

---

[1] That the nonprofit character of the corporation did not deprive it of possible status as a libel plaintiff, see *Boston Nutrition Soc'y, Inc.* v. *Stare,* 342 Mass. 439, 442 (1961).

way of authorizing the defendant to pursue an appeal from the order in the Appeals Court. See *Foreign Auto Import, Inc.* v. *Renault Northeast, Inc.*, 367 Mass. 464, 470 (1975).[2] When the appeal was lodged in the Appeals Court, this court took it for direct review. We reverse. Judgment will enter for the defendant.

From the papers supporting and opposing the defendant's motion, the following appears without material dispute. For some time prior to January 25, 1977, the plaintiff on behalf of the town policemen was engaged in collective bargaining with the Ware board of selectmen consisting of three members. On that date a contract was executed between the International Brotherhood and the town. This had the approval of two selectmen, but was opposed by the third, Abraham Goodman, chairman of the board. The contract was contingent upon its being approved and funded by the town. That was to be decided by the citizens at a special town meeting called for February 22. Meanwhile officials and members of the plaintiff organization were attempting to persuade the public to vote affirmatively.

On February 2, Norton, as executive director of the International Brotherhood, wrote to Goodman in a tone of warning. Norton took the position that as a majority of the board of selectmen had approved a collective agreement, but Goodman had not, "you are prohibited from speaking against the contract, but must support it. . . . Any unlawful violation upon your part could result in enormous and needless outpouring of taxpayers' monies in legal action and possibly against you personally under Chapter 150E of the General Laws."[3]

---

[2] See, however, the general policy disfavoring appeal from interlocutory orders such as one denying summary judgment. *Cappadona* v. *Riverside 400 Function Room, Inc.*, 372 Mass. 167, 169 (1977). *Kargman* v. *Superior Court*, 371 Mass. 324, 329-330 (1976). *Corbett* v. *Kargman*, 369 Mass. 971 (1976). Ordinarily such appeal is possible only on the basis of a report by the judge who made the order. G. L. c. 231, § 111.

[3] The reference was to the statute on collective bargaining of public employees. Although the matter has no necessary bearing on the result in the

On February 12, Norton addressed a letter to the Federal Communications Commission (FCC) stating that "members of the Ware, Massachusetts Police Department have been complaining bitterly over radio station WARE's vocal vendetta against them in news items and on the station's talk show"; that the situation had become "anti-police" with "almost a daily and constant cacophony of police misinformation, unfounded allegations of police procedures and actions, deliberate distortions of facts." Two officials of the station, said Norton, had made a demand on the police department "to subvert the law" and "[f]ailure to comply . . . would bring about the molding of public opinion against a pending police contract, subversion of a governmental process (town meeting), interfere with a contractual agreement, and otherwise force certain police officers to compromise their oath of office." The letter concluded: "As representatives of the police in Ware, and acting from their demand, we respectfully request that the agency conduct a full-scale investigation and to determine if station WARE is fit to retain its license."

On February 16, the Ware River News, the local newspaper, published the text of the letter to the FCC, and, referring to the letter to Goodman, reported that "Goodman last week rejected the [International Brotherhood's] position as an infringement of his first amendment rights." It also reported Vaughan's comments. Vaughan said the station was providing unbiased news coverage for the area and a public forum through the talk show, and he pointed to a lack of specificity in the charges made to the FCC.

We come now to the utterances on the February 17 (Thursday) talk show, a program called "Sound Off," having the familiar format of members of the audience calling

---

present case, it may be pointed out that Norton's statement about Goodman's supposed legal obligation was exceedingly rash and ill-advised. See *Labor Relations Comm'n* v. *Selectmen of Dracut,* 374 Mass. 619, 625-626 (1978); *Boston Teachers Local 66* v. *School Comm. of Boston,* 370 Mass. 455, 471-475 (1976); *Mendes* v. *Taunton,* 366 Mass. 109, 117-119 (1974).

in and conversing with the announcer or host.[4] (In the following narrative, we italicize the words alleged in the complaint to constitute the libel: the complaint did not set out the rest of the colloquies on the program, nor did it provide the background of the letters and so forth.)[5] Goodman called, identified himself, and said he was "very angry." "Why is that?" "*Because we're supposed to be living in a free and a democratic country and I don't think we are. This episode with the police union making demands on the station as well as myself, I want to go on record publicly that I will support the station a hundred percent.*" "*Thank you very much.*" "*Because, if we do not get together and stop the inroad of communism, something will happen.*" "*Well, I agree with everything you're saying . . . .*" Murphy went on to refer to an editorial in the newspaper (again February 16) severely critical of the union, and she said, "it's up to the Ware taxpayers . . . to handle the affairs of the Town . . . and that's what we elected you to do and if you can't speak . . . ." Goodman broke in to ask all to come to the special town meeting and said he would ask for a secret ballot to avoid intimidation by the police department. He then discussed at some length the financial situation of the town in relation to the funding required for the

---

[4] Station WARE had an electronic delay-abort system allowing the host of the program (or other monitoring station employee) ten seconds in which she could "scrub" a conversation from the air. For purposes of the present case, no particular importance need be attached to the presence of the electronic system. For those purposes we need not stress the fact that Murphy had little time for deliberation, a circumstance that has on occasion weighed in favor of a libel defendant (see *Stone* v. *Essex County Newspapers, Inc.,* 367 Mass. 849, 869-870 [1975]; *Priestley* v. *Hastings & Sons Publishing Co.,* 360 Mass. 118, 123 [1971]), nor need we refer to the characterization of these talk programs as "the modern version of the town meeting in vogue earlier in our country's history." *Adams* v. *Frontier Broadcasting Co.,* 555 P.2d 556, 566 (Wyo. 1976).

[5] A judge of the Superior Court denied the defendant's motion to dismiss the bare amended complaint for failure to state a claim, Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974). Thereafter the defendant filed its answer, and, supplying the full text of the program and the background material, moved for summary judgment.

379 Mass. 220                                                          225

National Association of Government Employees, Inc. *v.* Central Broadcasting Corp.

police contract, and renewed his plea for full attendance at the special town meeting (as well as at the annual meeting in May). Murphy said, "[T]he only unfortunate part is and it's too bad that you as our Chief Executive won't be able to speak . . . at the special town meeting," but no one could be stopped from voting. Goodman said he understood that the attorney for the union would be present and ask to speak at the forthcoming meeting, and if the moderator allowed that intervention, he, Goodman, should be privileged to speak. Murphy agreed that if an outsider could talk, so should the chairman of the board of selectmen. Goodman reiterated that he should have the opportunity to speak, and Murphy agreed and hoped for a big turnout at the meeting. Goodman: "Well, I hope so. But, *again, I want to say that if there is anything I can help the station towards fighting the inroads of communism which in this particular case is the union, police union, I will be glad to help.*"

Later in the program, an anonymous caller expressed resentment that Goodman had called the police department communist, when a main factor in a person's becoming an officer is his concern about the country and the community, and the police department was doing a good job and Ware had a low crime rate. "Now, if his Department is Communist and he is the leader of this Department[6] then he's a Communist." Murphy said: "Mr. Goodman did not say anything about the Police Department being Communist. What he said was the infringement upon a basic American Democratic right, and that is the right to free speech, is being infringed upon by this union, this International Union or Brotherhood of Police Officers that is coming in, and first of all telling the Chairman of the Board of Selectmen, an elected official of the taxpayers, that he cannot speak, and secondly, is now saying that the radio station, which is licensed to serve community needs is not doing that and is now on a, I believe the word is, vocal vendetta. . . . How-

---

[6] By virtue of his office as chairman of the board of selectmen.

ever, as far as Mr. Goodman saying anything about the Police Department being Communist, you're incorrect. What he was saying is that this union is attempting to subvert the right to free speech . . . ."[7]

The following three independent but converging lines of authority demonstrate that the defendant was entitled to summary judgment.

1. *Opinion on disclosed or assumed facts.* For purposes of the point now to be made, we indulge the assumption that the statement of opinion embodied in the word communism could carry a libelous meaning or connotation, and that the opinion was attributable to the defendant through adoption by its employee. Still on the record there was no genuine issue for trial. This was because the facts basing the opinion were apparent and disclosed (and it is not contended that they were themselves libelous; in any event, they were truly stated or referred to). Those facts were that the plaintiff union had warned Goodman against speaking adversely at the town meeting — the substance of the letter of February 2; and had sought an FCC investigation of the defendant's right to retain its station license (which might make the station wary of criticizing the union ) — the letter of February 12. Murphy's statement at the end of the broadcast pointed to these facts and gave her opinion, in effect, that they amounted to an attempt to subvert free speech (and in that sense resembled communist tactics). In the light of the facts, hearers could make up their own minds and generate their own opinions or ideas which might or might not accord with Murphy's. These circumstances remove the case from the category of actionable defamation, no matter how invidious or derogatory the ex-

---

[7] After a telephone conversation on February 17 with Henry Gagnon, president of Local No. 398, Vaughan wrote to Gagnon on February 18 that he was making the talk show available to Gagnon's group on February 21 (Monday). This offer was refused by letter of February 19 from "Membership Ware Local 398 I.B.P.O."

The special town meeting on February 22 voted against funding the contract.

pression "communism" is conceived to be. In a larger view, a state of affairs in which opinion is recognizable as such because its factual ingredient is known or assumed, presents a clear case for full First Amendment protection including freedom from civil liability.

"We begin with the common ground. Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact." *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 339-340 (1974) (footnote omitted). From these principles, with their constitutional roots, the American Law Institute derived § 566 of Restatement (Second) of Torts (1977): "*Expressions of Opinion.* A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." The matter is put thus in Comment c, second par.: "A simple expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is. But an expression of opinion that is not based on disclosed or assumed facts and therefore implies that there are undisclosed facts on which the opinion is based, is treated differently."[8] Thus if I write, without more, that a

---

[8] The evolution of new § 566 is traced in Christie, Defamatory Opinions and the Restatement (Second) of Torts, 75 Mich. L. Rev. 1621 (1977). Under old § 566, a derogatory expression of opinion, although based on disclosed or assumed facts, could be actionable. New § 566 is to the contrary. Its text engrosses and renders unnecessary anything on the order of old § 567 as to expressions of opinion on undisclosed facts, and also supersedes old §§ 606-607 regarding fair comment. Accordingly the three sections were eliminated. Note the statements in *Orr* v. *Argus-Press Co.,* 586 F.2d 1108, 1113-1114, 1115-1117 (6th Cir. 1978), and *Mashburn* v. *Collin,* 355 So. 2d 879, 882-883 (La. 1977), about the relation of the rule of *New York Times Co.* v. *Sullivan,* 376 U.S. 254 (1964), to preexisting doctrine concerning fair comment. Cf. *Hartmann* v. *Boston Herald-Traveler Corp.,* 323 Mass. 56 (1948).

person is an alcoholic, I may well have committed a libel prima facie; but it is otherwise if I write that I saw the person take a martini at lunch and accordingly state that he is an alcoholic. See Illustrations 3 and 4 to § 566. The rule and the distinction are confirmed by the recent cases. See *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers* v. *Austin,* 418 U.S. 264, 282-287 (1974); *Greenbelt Coop. Publishing Ass'n* v. *Bresler,* 398 U.S. 6, 14 (1970); *Orr* v. *Argus-Press Co.,* 586 F.2d 1108, 1114-1115 (6th Cir. 1978), cert. denied, 440 U.S. 960 (1979); *Edwards* v. *National Audubon Soc'y, Inc.,* 556 F.2d 113, 121 (2d Cir.), cert. denied sub nom. *Edwards* v. *New York Times Co.,* 434 U.S. 1002 (1977); *Hotchner* v. *Castillo-Puche,* 551 F.2d 910, 913 (2d Cir.), cert. denied sub nom. *Hotchner* v. *Doubleday & Co.,* 434 U.S. 834 (1977); *Hoover* v. *Peerless Publications, Inc.,* 461 F. Supp. 1206, 1209-1210 (E.D. Pa. 1978); *Mashburn* v. *Collin,* 355 So. 2d 879, 884-885 (La. 1977); *Rinaldi* v. *Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 380-381 (1977); *Wehringer* v. *Newman,* 60 App. Div. 2d 385, 390 (N.Y. 1978).[9] If there should be any doubt about the sweep of the reasoning as applied to what may be termed private libels, there can, we think, be none in cases like the present where we have a public communication directed to a "public figure" (delineated below) on a matter of public concern. See § 566, Comment c, first par.

2. *Too amorphous a characterization to be actionable.* Point 1 holds firm, as we have noted, on the assumption that the label communism is libelous. But that assumption becomes threadbare when setting and meaning are further explored.

The word was used in the midst of a public debate looking to a town meeting where sides would have to be taken.

---

[9] For example, in *Greenbelt, supra,* the "simple expression of opinion" (§ 566, Comment c, second par.) that the plaintiff was engaged in "blackmail" could not ground a libel action in the light of the disclosed facts; in *Letter Carriers, supra,* the same applied to the charge "scab" as amplified by the violently vituperative definition of that term by the novelist Jack London circulated by the plaintiff letter carriers' union.

The subject was a labor contract said to be sponsored by an "outside" union and to threaten to add to the tax rate. This was an occasion on which voices could be expected to be raised in sloganeering invective. (The plaintiff's letter of February 12 is an example.) The target public, whose votes were being solicited, would be particularly critical and skeptical of hyperbolic statements from any source, as they notoriously are toward election oratory. Cf. *Poland* v. *Post Publishing Co.*, 330 Mass. 701, 704 (1953); *Aldrich* v. *Boyle*, 328 Mass. 30, 32 (1951); *Twohig* v. *Boston Herald-Traveler Corp.*, 346 Mass. 654, 656 (1964) (Cutter, J., dissenting).[10]

Of course Goodman did not mean to charge the plaintiff with complicity in the atrocities of Solzhenitsyn's Gulag Archipelago or other horrors distinctive of a totalitarian regime. No group in the community after even brief reflection would understand Goodman to be making such a charge. Against the background, "communism" would most likely be taken by the audience as mere pejorative rhetoric, abusive of the plaintiff for what it had done or appeared to have done in attempting to squelch criticism. In this there would be no libel. Restatement (Second) of Torts § 566, Comment e (1977).

If the word carried some further meaning or overtone (which is very doubtful), it was too vague to be cognizable as the subject of a defamation action. Our case in this respect resembles or perhaps is stronger for the defendant than *Buckley* v. *Littell*, 539 F.2d 882 (2d Cir. 1976), cert. denied, 429 U.S. 1062 (1977), where the title of fellow traveler of fascism (or variants), applied to the publicist William F. Buckley, Jr., in a context of mutual ideological recriminations, was held to have "tremendous imprecision" and to be too "loosely definable," too "variously interpretable," to be considered actionable as a defamation. *Id.* at 893, 895. Incidentally, the court noted a possible difference between the vague expression there at bar and a specif-

---

[10] Another appearance of the *Twohig* case is at 362 Mass. 807 (1973).

ic charge of association with "the Fascisti, or the Nazis, or the Falangists, or a mythical Fascist Party of America" (*id.* at 893-894, n.11); so also a possible difference between attacking a person for "communism," and charging him specifically with being "a member of the Communist Party, or a legislative representative of the Communist Party." *Id.* at 894. The Supreme Court of the United States would consider an undifferentiated cry of "fascist" in the course of a labor-management dispute as an unamiable but nonlibelous utterance (see *Letter Carriers, supra,* 418 U.S. at 284; cf. *Linn* v. *United Plant Guard Workers Local 114,* 383 U.S. 53 [1966]); and we can be sure that "communist" would fare the same. In like manner, common sense repels any suggestion that there was a charge worthy or indeed capable of trial in the present situation. "An assertion that cannot be proved false cannot be held libelous." *Hotchner, supra,* 551 F.2d at 913.[11]

3. *No genuine issue as to "knowledge of falsity" or "reckless disregard."* Assuming an otherwise actionable defamation, its object here was a "public figure" within the meaning of the *Gertz* case, *supra,* 418 U.S. at 351,[12] so that the plaintiff had the ultimate burden of proving that the defendant's representative adopted Goodman's statement "with knowledge that it was false or with reckless disregard

---

[11] The point may be made by trying to imagine, after reading his interposition on the "Sound Off" program, how the anonymous caller would have attempted to define communism.

[12] If not an all-purpose public figure, this public-employee union was surely a public figure of limited range as matter of law: "That designation [public figure] may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions." *Gertz, supra,* 418 U.S. at 351. See *Stone, supra,* 367 Mass. at 865-867; Annot., 75 A.L.R.3d 616 (1977). We may note, also, that the present case involves collaterally but nevertheless significantly the right of expression of Goodman as a public official.

379 Mass. 220                                                231

National Association of Government Employees, Inc. *v.* Central Broadcasting Corp.

of whether it was false or not." *New York Times Co.* v. *Sullivan,* 376 U.S. 254, 280 (1964). And the plaintiff's proof on the point must be "clear and convincing" (*Gertz, supra,* 418 U.S. at 342), as that heavy measure was described by us in *Callahan* v. *Westinghouse Broadcasting Co.,* 372 Mass. 582, 587-588 (1977).

To support a motion for summary judgment, the defendant was required to establish that on the evidence brought forward, considered with an indulgence in the plaintiff's favor, a jury could not reasonably conclude that the plaintiff had shouldered and carried the burden above mentioned. See the extensive discussion in *Nader* v. *deToledano,* 408 A.2d 31 (App. D.C. 1979).[13] As "knowledge" or "reckless disregard" is a subjective matter, a question of state of mind, quite distinct from any question of objective reasonableness or prudence (see *St. Amant* v. *Thompson,* 390 U.S. 727, 731 [1968]), the Supreme Court doubted a statement by a lower court that decision on motion for summary judgment should be "the rule rather than the exception." *Hutchinson* v. *Proxmire,* 443 U.S. 111, 120 & n.9 (1979). But "that does not mean that a party against whom summary judgment is sought is entitled to a trial simply because he has asserted a cause of action to which state of mind is a material element. There must be some indication that he can produce the requisite quantum of evidence to enable him to reach the jury with his claim." *Hahn* v. *Sargent,* 523 F.2d 461, 468 (1st Cir. 1975), cert. denied, 425 U.S. 904 (1976).[14]

---

[13] In the *Nader* case the court points out that according to one approach to summary judgment motions in "public official" or "public figure" defamation cases, the defendant is held to less than the customary demanding standard because of First Amendment considerations. See, e.g., *Wasserman* v. *Time, Inc.,* 424 F.2d 920 (D.C. Cir.), cert. denied, 398 U.S. 940 (1970). Without attempting to decide whether any such relaxation is justifiable, we are applying in the present case the usual standard for summary judgment as set out in our text.

[14] From the *Nader* case, *supra,* 408 A.2d at 41 n.5, 43 n.7, we learn that in the large majority of cases where a public official or public figure has been held to be involved, proof of "knowledge" or "reckless disregard" has failed, and in many cases the disposition has come on summary judgment.

Here Murphy's statement at the close of the broadcast describes her state of mind: she understood Goodman to be attacking the plaintiff for trying to stifle criticism of the labor contract. It is not to be overlooked that her statement was made substantially contemporaneously with the alleged libel. Cf. *Walsh* v. *Wyman Lunch Co.*, 244 Mass. 407, 409 (1923). Murphy's affidavit is in the same vein.[15] Both avowals are impressive and in the milieu of the case tend strongly to indicate that on the part of the defendant there was no question of knowing falsehood or reckless indifference to falsity. The plaintiff produced an affidavit of Norton asserting that the defendant was hostile toward the plaintiff and working against it. But it has been repeatedly observed that that does not approach a showing of the mordant unconcern with the truth of the particular statement which is crucial to the claim of defamation by a public figure. See *Cantrell* v. *Forest City Publishing Co.*, 419 U.S. 245, 251-252 (1974); *Beckley Newspapers Corp.* v. *Hanks*, 389 U.S. 81, 82 (1967).[16] Conspicuously lacking from the Norton affidavit are any of the usual bases for inferring the guilty state of mind: "[A] story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. . . . [T]he publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. . . . [T]here are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant, supra*, 390 U.S. at 732. We note finally that the plaintiff, having available to it the instruments of pretrial discovery to seek out proof of the crucial state of mind (see *Herbert* v. *Lando*,

---

[15] In her affidavit Murphy, after setting out her understanding of Goodman's remarks, says frankly, and as showing further that she had no guilty state of mind, that she did not at the time of the broadcast consider whether there might be some listeners who would understand Goodman's remarks as a charge of actual espousal of communism, or whether the plaintiff's organization might in fact be connected with communism.

[16] Indeed it is at this point that the current law departs from the earlier qualified privilege of fair comment.

441 U.S. 153 [1979]), made no effort, so far as appears, to depose Murphy or others who might have information. On the record as we have it, there is no issue for a jury as to one or more material facts.

To conclude, it appears that our result is compelled by doctrines deriving ultimately from the First Amendment as interpreted by the Supreme Court;[17] but, were it not constitutionally required, we would reach the same result, believing that the action is plainly without merit and the prospect of forcing the defendant to trial in such a case would put an unjustified and serious damper on freedom of expression.[18]

*Order reversed.*

*Judgment for defendant.*

---

[17] We observe that the older defamation cases based on attribution to plaintiffs of unpopular political or social beliefs must be reexamined in light of the doctrines considered in the present opinion which reflect constitutional developments since the *New York Times* case. A prevision of the constitutional problems appears in Judge Charles E. Clark's dissent in *Sweeney* v. *Schenectady Union Publishing Co.*, 122 F.2d 288, 290 (2d Cir. 1941), aff'd by equally divided Court, 316 U.S. 642 (1942).

[18] The plaintiff in its complaint alleged damages of $3,000,000 — a claim of compensatory damages in that amount, since punitive damages "in any defamation action" were outlawed by us in the *Stone* case (367 Mass. at 860). This was a not inconsiderable contingent liability for a small radio station to have to note on its financial statements. A question is raised whether such an averment as to damages squares with Mass. R. Civ. P. 11 (a), 365 Mass. 753 (1974), providing in part that "[t]he signature of an attorney to a pleading constitutes a certificate by him . . . that to the best of his knowledge, information, and belief there is a good ground to support it. . . ."