Wilkins, Douglas H., J.
In this employment action, Constance A. Reid (“Reid”) alleges that her former employer, Beaumont Nursing Home (“Beaumont”), and two of its supervisory employees, Andrew Salmon (“Salmon”) and Sandra Rasaras (“Rasaras”), engaged in various unlawful cost-cutting practices that led to Reid’s constructive discharge from her position as a nursing supervisor at Beaumont.
On May 20, 2009, the Court (Lemire, J.) allowed the defendants’ motion to dismiss as to several of Reid’s claims and allowed Reid’s motion to dismiss Beaumont’s counterclaim. What remains are counts against Beaumont for breach of implied contract (Count I); breach of contract (Count II); and retaliation in violation of G.L.c. 149, §187(b)(l) & (3) (Count V); and counts against Beaumont and Rasaras for defamation (Counts X and XI). The matter is before the Court on the defendants’ motion for summary judgment on all counts. For the reasons below, the motion is ALLOWED in part and DENIED in part.
BACRGROUND
The Court draws the following facts from the summary judgment record and, where they are disputed, views them in the light most favorable to Reid. See Attorney Gen. v. Bailey, 386 Mass. 367, 371 (1982).[3]
Beaumont operates a rehabilitation and nursing center in Northbridge, Massachusetts. At all relevant times, Salmon was Beaumont’s Administrator and Rasaras was Beaumont’s Nursing Director.
Reid is a former employee of Beaumont. She began working as a nurse on a per diem basis in 2001. In March 2005, she accepted a position as a charge nurse. In the fall of 2005, Rasaras approached Reid about taking a position as a nursing supervisor. The position, as Rasaras described it at the time, would have required Reid to be a “working supervisor,” which meant that, in addition to her new supervisory duties, she would also be required to resume her responsibilities as a charge nurse. Reid objected to this staffing practice and declined the position. She repeatedly asked Rasaras to hire additional experienced charge nurses to address the dangers that the staff shortage posed to Beaumont’s patients, but Rasaras failed to do so. Instead, Rasaras hired inexperienced temporary nurses to fill assignments.
On November 7, 2005, Reid accepted a position as nursing supervisor, with the understanding that Rasaras would hire additional charge nurses to assume Reid’s former duties. The position focused primarily on administrative duties and nurse training, but the Job Description also included “assisting in the *389 more complicated nursing procedures, if necessary” and being “prepared to cover an assignment in an emergency if a charge nurse is not available.” Joint App., Tab A. 1, Exh. B. Under Paragraph 8, titled “Supervision Exercised,” the Job Description stated that the nurse supervisor “[e]xercises working supervision over a number of R.N.’s, L.P.N.’s, attendants, bathers, and bedmakers.” Id. Reid and Kasaras both signed the Job Description.
Because of staffing issues during her assigned 11:00 p.m. to 7:00 a.m. shift, Reid was frequently called upon to perform the duties of a charge nurse, which effectively made her a “working supervisor.” Her responsibilities stood in stark contrast to those of the nursing supervisor assigned to the 3:00 p.m. to 11:00 p.m. shift, Anne Grigoriadis (“Grigoriadis”), who had been required to perform charge nurse duties only on rare occasions. Grigoriadis had signed a Job Description similar to Reid’s.
On July 21, 2006, Reid’s shift was understaffed, leaving Reid to supervise the facility and to provide nursing care to patients on the entire third floor, which was typically the most demanding floor. That day, Reid tendered her resignation, which Kasaras and Salmon did not accept. Salmon was scheduled to meet with Reid on August 1, 2006, to discuss Reid’s concerns about staffing and other deficiencies, such as a shortage of necessary supplies, but the meeting was rescheduled for August 10, 2006.
On August 8, 2006, Reid was assigned to work her usual shift 11:00 p.m. to 7:00 a.m. shift as nursing supervisor, and was also assigned to work as a charge nurse on a third-floor wing. Shortly before Reid’s shift began, Grigoriadis informed Reid that a patient on the second floor needed her IV replaced. Reid told Grigoriadis that she did not have time, and advised her to call StatCare to replace the IV. At 11:45 p.m., a second-floor nurse called Reid and asked her to re-insert the patient’s IV. Reid said that she was too busy tending to a dying patient on the third floor, and instructed the nurse to call StatCare. Instead, unbeknownst to Reid at the time, the nurse called the patient’s physician, who ordered that the patient be transferred to the hospital. The patient was reluctant to leave, so an EMT re-inserted the IV.
On August 9, 2006, Reid was in the nurses’ station when she received a phone call from Kasaras. Kasaras screamed loudly that Reid was “disgusting” and had committed neglect by not tending to the patient who had needed her IV replaced.[4] People in the vicinity stopped what they were doing and looked at Reid.
Reid later explained to Kasaras that she had been too busy to leave her dying patient, to which Kasaras replied that Reid should have “medicated” the patient and “moved on.” Kasaras stated that she was going to suspend Reid. Reid informed Kasaras that she would sooner quit than accept a suspension based on a bogus neglect charge. After the confrontation, Kasaras went to the nursing schedule that was displayed for all employees, scribbled out the hours next to Reid’s name, and wrote “resigned.”[5] Kasaras discussed Reid’s actions with Salmon, stating that she believed Reid had committed neglect and that the matter should be reported to the Department of Health.
On August 10, 2006, Reid met with Salmon to discuss the IV incident. Salmon told Reid that she could return to work on August 16th if she agreed to serve a three-day suspension. He asked for her decision by noon the next day. Salmon assured Reid that if she agreed to sign the suspension notice, she could continue to work pending the outcome of a Department of Health investigation into her conduct. He agreed to let Reid attach a written statement to the suspension notice and to the neglect charge that was to be filed with the Department of Health. On Friday, August 11, 2006, Reid tried multiple times to reach Salmon before noon to confirm her acceptance of the suspension, but he did not return her calls. On Monday, August 14, 2006, Reid arrived ready to sign the suspension notice, but Salmon instead asked for her resignation and told her that she could not return to work.
DISCUSSION
I. Standard of Review
Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). The moving party bears the burden of affirmatively showing that there is no triable issue of fact. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). A party moving for summary judgment who does not have the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the nonmoving party’s case or by showing that the nonmoving party has no reasonable expectation of proving an essential element of its case at trial. Kourouvacilis, 410 Mass. at 716. Once the moving party “establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact.” Pederson, 404 Mass. at 17. The opposing party cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment. LaLonde v. Eissner, 405 Mass. 207, 209 (1989). The Court reviews the evidence in the light most favorable to the nonmoving party, but does not weigh evidence, assess credibility, or find facts. Bailey, 386 Mass. at 370-71.
II. Analysis
1. Count V (Retaliation in Violation of G.L.c. 149, § 187(b)(1) & (3) Against Beaumont)
Because the regulations governing nursing homes play a significant role in many of the claims in this *390 case, the Court begins with the “whistleblower” claim, which addresses those regulations most directly. Count V alleges that Beaumont falsely accused Reid of neglect and constructively discharged her because she complained that Beaumont’s policies and practices regarding patient care fell below professional standards and because she objected to and/or refused to participate in such practices. See G.L.c. 149, § 187(b)(1) & (3). The defendants argue that Beaumont is entitled to summary judgment on Count V because Reid has offered no evidence that Beaumont’s staffing policies and practices violated any law, rule, regulation, or professional standard. See Romero v. UHS of Westwood Pembroke, Inc., 72 Mass.App.Ct. 539, 540-41 (1998) (discussing elements of G.L.c. 149, §187 retaliation claim).
As Reid points out, Beaumont’s contentions that its nurse-to-patient ratio met the minimum requirements of 105 Code Mass. Regs. §150.007 and that independent surveyors did not cite Beaumont for staffing violations from 2005 to 2007 do not necessarily preclude the possibility that Beaumont committed violations in other significant respects.
For example, 105 Code Mass. Regs. §150.007(A) states broadly that “[a]ll facilities shall provide appropriate, adequate and sufficient nursing services to meet the needs of patients or residents and to assure that preventive measures, treatments, medications, diets, restorative services, activities and related services are carried out, recorded and reviewed.” On the subject of minimum nursing personnel requirements, 105 Code Mass. Regs. §150.007(B)(1)(e) provides: “The minimum staffing patterns and nursing care hours as contained herein shall mean minimum, basic requirements. Additional staff will be necessary in many facilities to provide adequate services to meet patient needs.”
There is ample evidence in the record that, notwithstanding Beaumont’s apparent compliance with the regulatory “basic minimum” of nursing care hours per Level I patient,[6] Reid reasonably believed that Beaumont failed to adjust its services to meet the present needs of its patients. Whether this belief was objectively reasonable is a question of fact for the jury. Contrast Romero, 72 Mass.App.Ct. at 542 (absent evidence of any law, rule, regulation, or professional standard governing the defendant facility’s proposed patient census increase, the plaintiff could not have had an objectively reasonable belief that the proposed increase was in violation of any statute, rule, regulation, or professional standard).
2. Count I (Breach of Implied
Contract Against Beaumont)
Count I alleges that Beaumont breached the implied terms of its employment contract with Reid by (1) failing to hire a replacement charge nurse to assume Reid’s former duties; (2) failing to give Reid sufficient authority to manage and resolve staffing problems; and (3) essentially forcing Reid to perform the work of three positions without additional compensation. The defendants argue that Beaumont is entitled to summary judgment on Count I because the parties never agreed that Reid would be entitled to separate compensation for each role that she played as a “working supervisor,” namely, nurse supervisor, charge nurse, and nurse trainer.
Reid’s failure to produce evidence that she reasonably expected additional compensation for those duties is not dispositive of her implied contract claim, particularly in light of the regulatory context in which the implied terms arose. Viewing the facts in the light most favorable to Reid, an implied term of her employment as a nurse supervisor was that Kasaras would hire additional charge nurses to alleviate Reid’s workload so that she could focus on the supervisory aspects of her new role. See Weber v. Community Teamwork, Inc., 434 Mass. 761, 780 (2001), citing O’Brien v. New England Tel. & Telegraph Co., 422 Mass. 686, 692-93 (1996) (“Where an employee signs a personnel policy, [or] negotiates specific terms as a condition of beginning or continuing employment... a finding that the terms of the policy form the basis of an implied contract may be justified”). A jury could find that the implied terms fulfilled a crucial element of Reid’s professional responsibility.
Although the record supports the defendants’ argument that separate payment for each distinct role was not an implied term of Reid’s employment contract, Reid may nevertheless be entitled to some other measure of contract damages (even if only nominal) arising from the defendants’ failure to honor their representations regarding the scope of her duties as a nursing supervisor. Because there is a genuine issue of material fact as to whether Beaumont breached an implied term of its employment contract with Reid by not hiring sufficient staff to enable Reid adequately to perform her responsibilities, summary judgment is improper.
3. Count II (Breach of Contract Against Beaumont)
Count II alleges that Beaumont breached an agreement that Reid could continue in her role as nurse supervisor if she agreed to serve a three-day suspension for her conduct during the August 8, 2006 IV incident. The defendants seek summary judgment on the grounds that Salmon’s alleged promise was illusory, as he remained free to terminate Reid’s at-will employment without reason at any moment after permitting her to continue working. This argument is as unpersuasive now as it was when the Court (Lemire, J.) rejected it at the motion to dismiss stage. See Simons v. American Dry Ginger Ale Co., 335 Mass. 521, 525 (1957) (“Even if the contract is construed as terminable at will for the future by either party on reasonable notice, that does not necessarily make the contract illusory and unenforceable with respect to *391 any period prior to such a termination” (internal citations omitted)).
Even assuming that this particular agreement, unlike the one in Simons, was terminable without notice, the promise of continued employment was enforceable until such time as Beaumont actually exercised its right to terminate the relationship. See Restatement (Second) ofTorts §766, cmt. g., at 10-11 (1979) (agreement at will is “valid and subsisting,” until terminated). Cf. Harrison v. NetCentric Corp., 433 Mass. 465, 477 (2001) (“The nature of an at-will employment contract does not, by itself, preclude a finding that a relationship exists with which there can be tortious interference”). Viewing the facts in the light most favorable to Reid, there is a genuine dispute as to whether Salmon in fact terminated Reid on August 14, 2006, after she had accepted his offer of continued employment beginning on August 16th, or whether Salmon was simply acting on the presumption that Reid had offered to quit via voicemail on August 9th, in which case Reid’s resignation was superseded by her acceptance of Salmon’s subsequent offer of continued employment.[7]
In any event, Beaumont may not claim the benefit of the at-will employment doctrine if it terminated Reid for engaging in protected activity under the medical whistleblower statute, G.L.c. 149, §187(b)(l) & (3). See, e.g., GTE Prods. Corp. v. Stewart, 421 Mass. 22, 26 (1995) (recognizing that whistleblowers may fall within narrow public policy exception to employment at-will doctrine). See also Shea v. Emmanuel Coll., 425 Mass. 761, 763 (1997) (whistleblowers need not complain outside organization to claim protection of public policy exception).
4. Counts X and XI (Defamation Against Beaumont and Rasaras)
Reid’s defamation claims stem from the August 9, 2006 incident in which Rasaras called Reid “disgusting” and accused her of neglecting a patient. The defendants argue that (a) Reid cannot establish that the comments were published to third parties; (b) even if the statements were published, the “disgusting” remark is nonactionable opinion; and (c) summary judgment is proper on the remainder of the allegations because any statements concerning Reid’s neglect of a patient were conditionally privileged. The Court disposes of the defamation claims on the first ground, but briefly addresses the other grounds, as well.

a. Publication

The defendants argue that Reid cannot prevail on her defamation claims because she cannot establish that anyone actually overheard Rasaras’ statements. In support of their position, they cite the testimony of employees that Reid identified as being present at the time, all of whom testified that they did not overhear the alleged statements.
“The element of publication is satisfied where the defamatory communication is transmitted to even one person other than the plaintiff.” Phelan v. May Dep't Stores Co., 443 Mass. 52, 56 (2004). Reid suggests that her testimony regarding the loud volume of Rasaras’ diatribe and the subsequent reactions of nearby coworkers raises an inference that at least one third party overheard the substance of Rasaras’ statements and allowed them to color his or her opinion of Reid.
The Court concludes that the defendants have submitted affirmative evidence negating an essential element of Reid’s defamation claims, and Reid has failed to respond with sufficient facts to establish a genuine issue of material fact. See Pederson, 404 Mass. at 17. The Court relies in particular on Reid’s concession that “(o]ther than eveiybody coming to a complete stop at th[e] nurse’s station” during Rasaras’ rant, she has no knowledge whether or not anyone heard precisely what Rasaras said. Joint App., Tab G.4, p. 99.
The co-workers’ reactions are just as consistent with the reactions one might expect of people who had simply heard the indistinct bellowing of a supervisor as they are with Reid’s speculation that their reactions were in specific response to charges that Reid had neglected a patient. See Benson v. Massachusetts Gen. Hosp., 49 Mass.App.Ct. 530, 532 (2000) (plaintiff may not defeat summary judgment by “invit[ing] a decision by the trier of fact resting on speculation”). Reid is also not entitled to an inference that subsequent rumors of her neglect sprang from Rasaras’ statements, as there is no dispute that the IV incident occurred, regardless of where the fault lay, and it is equally likely that third parties learned of the incident from other sources. See id. Because Reid has no reasonable expectation of establishing, without resort to speculation, that even one person was able to discern the substance of Rasaras’ statements of actionable fact from her screaming, the defendants are entitled to summary judgment on Reid’s defamation claims.

b. Kasaras’ reference to Reid as “disgusting”

Even assuming arguendo that there had been competent evidence of publication, Rasaras’ remark that Reid was “disgusting” would not have been actionable.
In a defamation action, “the defendant is entitled to summary judgment if the challenged statement cannot reasonably be construed as a statement of fact.” King v. Globe Newspaper Co., 400 Mass. 705, 709 (1987). See also Gertz v. Robert Welch, Inc., 418 U.S. 323, 339-40 (1974) (pure opinions not actionable because there is no such thing as false idea). A statement cannot be construed as an assertion of fact if it is not susceptible to being proven false. Cole v. Westinghouse Broadcasting Co., 386 Mass. 303, 312, cert. denied, 459 U.S. 1037 (1982). However, even a statement in the form of an opinion may be actionable if it implies the existence of undisclosed defamatory facts as the basis for the opinion. Myers v. Boston Magazine Co., 380 Mass. 336, 338-39 (1980). See also National *392 Ass’n of Gov’t Emps., Inc. v. Central Broadcasting Corp., 379 Mass. 220, 227 (1979), cert. denied, 446 U.S. 935 (1980) (“[A] simple expression of opinion based on disclosed or assumed nondefamatoiy facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is”). Whether a statement is one of fact or opinion is a question of law, unless it could reasonably be understood both ways. King, 400 Mass. at 709.
Kasaras’ alleged statement that Reid was “disgusting” is an expression of pure opinion and is not actionable. The statement did not imply the existence of facts, let alone undisclosed defamatory facts. Taken in context, it is quite clear that the factual predicate for Kasaras’ remark, if any, could only be her assertion that Reid had neglected a patient. Therefore, “hearers could make up their own minds and generate their own opinions,” which may or may not have been in accord with Kasaras’, as to whether the conduct ascribed to Reid warranted calling her “disgusting.” National Ass’n of Gov’t Emps., Inc., 379 Mass. at 226. Thus, even if Reid had offered competent evidence that the statements were published, the defendants would have been entitled to summary judgment as to so much of the defamation claim as is based on Kasaras’ reference to Reid as “disgusting.”[8]
c. Conditional privilege
The Court briefly addresses the defendants’ argument that the communications were protected by a conditional privilege.
The publication of otherwise defamatory information pertaining to an individual’s employment is conditionally privileged if it is reasonably necessary to serve the employer’s legitimate interest. Bratt v. International Bus. Machs. Corp., 392 Mass. 508, 509 (1984). “The conditional privilege is lost if the defendant (1) knew the information was false, (2) had no reason to believe it to be true, or (3) recklessly published the information unnecessarily, unreasonably, or excessively.” Sklar v. Beth Israel Deaconess Med. Ctr., 59 Mass.App.Ct. 550, 558 (2003). Whether publication is unnecessary, unreasonable, or excessive is, of course, very fact-dependent.
The defendants argue, correctly, that the conditional privilege extends to Kasaras’ report of the IV incident to Salmon, as Reid offered no evidence that Kasaras relayed any facts beyond what was necessary to determine whether Beaumont was required to report the incident to the Department of Health. However, if Reid had presented evidence of publication, the privilege would not necessarily have protected Kasaras’ loud accusations of neglect in front of Reid’s coworkers before an investigation into the alleged conduct had commenced. See Bratt, 392 Mass. at 513, citing Galvin v. New York, N.H. & H.H.R., 341 Mass. 293, 297-98 (1960) (loud and repeated public accusations concerning a plaintiff may constitute abuse of conditional privilege by an unnecessary, unreasonable, or excessive publication of the defamatory matter).
ORDER
For the foregoing reasons, it is hereby ORDERED that the defendants’ motion for summary judgment be ALLOWED as to Counts X and XI and DENIED as to Counts I, II, and V.

Upon reviewing the parties’ “Amended Superior Court Rule 9A(b)(5) Statement of Material Facts” (“Amended SOF”), the Court notes that Reid’s narrative responses do not comport with the spirit of the rule and are distracting. See, for example, her replies to Pars. 28 and 29, which provide a perfectly accurate overview of Reid’s whistleblower claim. It is not clear why the answer to the unobjectionable statement that “the plaintiff complained about the staffing levels at Beaumont” is not just one word: “Admitted.” See Amended SOF, Par. 29. Reid’s frequent attempts to explain or supplement her testimony and to correct what she perceives as mischaracterizations of the evidence may be fodder for her memorandum of law in opposition to the summary judgment motion, but they have no place in a joint statement of facts. See, e.g., Hon. Judith Fabricant, “Voice of the Judiciary: Just the Facts,” Boston Bar Journal (Summer 2011).
For their part, the defendants’ 'statement occasionally baited Reid with statements such as Par. 30, which is drawn directly from Salmon’s affidavit and is clearly framed as a legal argument rather than as a statement of fact. The Court strongly advises both sides to review Justice Fabricant’s article and the Appeals Court’s decision in Dziamba v. Warner & Stackpole, LLP, 56 Mass.App.Ct. 397, 399-401 (2002).

Several Beaumont employees whom Reid identified as having been within earshot when Kasaras accused Reid of neglect and called her “disgusting” testified that they did not hear Kasaras say such things about Reid.

The word “resigned” also appears written across the scheduled hours of Barbara Jameson on the same sheet. Joint App., Tab G.6. The word appears again in place of the scheduled hours of Paula Audet, Karen Paquette, and Barbara Aubin on another sheet. Joint App., Tab G. 11.

See Joint App., Tab F, SalmonAff., citing 105 Code Mass. Regs. §150.007(B)(2)(e).

Although the Court concludes that Beaumont’s right to terminate Reid’s employment at will is not a complete defense to Reid’s claim, the at-will nature of the relationship “is to be taken into account in determining the damages that the plaintiff has suffered by reason of its breach.” Restatement (Second) of Torts §766, cmt. g.

The Court attaches no significance to Kasaras’ notation on the nursing schedule that Reid had “resigned,” as Reid has offered no evidence that the term itself was susceptible of a defamatory meaning in the workplace. The fact that the word also appears next to other employees’ names undermines any argument that the context of Kasaras’ confrontation with Reid gave the word some special meaning. Furthermore, upon inspection of the schedule in question, it appears that Reid’s assertion that Kasaras “scrawled” the word beside her name “prominently” and “angrily" in “dark, large letters” is greatly exaggerated. PI. Opp., pp. 15-16: Joint App., Tab G.6.