KENNETH T. LYONS & another[1] vs. GLOBE NEWSPAPER
COMPANY & others.[2]

Suffolk. January 6, 1993. - May 13, 1993.

Present: LIACOS. C.J., WILKINS, ABRAMS, & GREANEY, JJ

*Libel and Slander. Constitutional Law*, Freedom of speech and press.

In a libel action, the writers and publishers of a newspaper article were
entitled to summary judgment where the statements challenged could
be understood, in the circumstances, only as expressions of opinion and
not as stating facts [261-264], and where the challenged opinions,
which disclosed nondefamatory factual support, did not imply defama-
tory facts [264-266].

The court stated that the State common law of defamation, protecting ex-
pressions of opinion based on disclosed or assumed nondefamatory
facts, was not altered by the decision of the Supreme Court of the
United States in *Milkovich* v. *Lorain Journal Co.*, 497 U.S. 1 (1990).
[266-269]

CIVIL ACTION commenced in the Superior Court Depart-
ment on June 14, 1990.

A motion for summary judgment was heard by *Hiller B.
Zobel*, J., and the case was reported by him to the Appeals
Court. The Supreme Judicial Court transferred the case on
its own initative.

*Jonathan M. Albano (E. Susan Garsh* with him) for the
defendants.

*Neal M. Brown (Meryl A. Kukura* with him) for the
plaintiffs.

LIACOS, C.J. This report comes to us on a stipulation of
agreed facts, together with the pleadings and certain memo-

[1]National Association of Government Employees, Inc., doing business as
International Brotherhood of Police Officers.

[2]Bruce Mohl, Frank Phillips, and Curtis Wilkie.

randa of law submitted to the trial judge. The underlying action is a defamation suit brought against Globe Newspaper Company, the publisher of The Boston Globe and The Boston Sunday Globe, and three of its reporters. The plaintiffs are the National Association of Government Employees, Inc. (NAGE), by its member union International Brotherhood of Police Officers, and the national president of NAGE (Lyons).

The facts are as follows. On June 2, 1990, the Massachusetts Democratic party held a political convention in Springfield to nominate candidates for State-wide office. Picketing organized by the Springfield police union precluded the convention from beginning at its scheduled time. For several hours, the picket line barred most delegates and candidates from the convention hall. The deadlock was broken in the early afternoon when a judge of the Superior Court ruled the picketing illegal and enjoined the police union from further demonstrating.

Following the judge's order, the convention was allowed to proceed. Four candidates competed for the gubernatorial nomination: Francis X. Bellotti, John H. Flood, Evelyn Murphy, and John Silber. Convention rules required that each individual candidate obtain at least 15% of the delegates' vote in order to qualify for the Democratic party's primary ballot. Francis X. Bellotti won the gubernatorial nomination. Both Evelyn Murphy and John Silber qualified for the party's primary ballot.

On the next day, the Boston Globe published an article on the convention and its disruption. See Appendix. The article stated that the picketing held the convention "hostage," and advanced three alternative explanations for the picketers' motives. First, the article referred to a labor dispute. Next, the article cited Democratic leaders' suspicion that members of the Republican party had "engineered the picketing as a political dirty trick." The Springfield police union, the article stated, had endorsed George Bush in the 1988 presidential elections. Thirdly, the article stated that "[c]ritics of Silber also voiced suspicions that his supporters promoted the picket

line to undercut the convention. The Springfield police union is a member of the National Association of Government Employees which is headed by Silber supporter Kenneth Lyons." The article added that supporters of John Silber had doubted his ability to garner 15% of the vote, and had "tried to exploit the confusion caused by the police picket to do away with the 15 percent rule."

The article reported the statements of various individuals who denounced the picketing. Comments attributed to Luis Prado, the executive director of La Alianza Hispana of Roxbury and a former United Nations monitor in Nicaragua, were reported to state that Prado thought "the situation was far worse than the February elections in Nicaragua." The article also quoted him as saying that the "Sandinistas never dared to do anything like that. This is like using brute force in politics."

On June 14, 1990, the plaintiffs commenced the present action in the Superior Court. In their complaint, the plaintiffs alleged that the article defamed them by conveying to the readers that the plaintiffs had conspired with the Springfield police union, with John Silber, and with Republican leaders, to disrupt the convention and to attempt to cause its cancellation. The plaintiffs also alleged that the article implied that they had engaged in criminal behavior, namely, conspiring to deprive the Democratic delegates of their civil rights peaceably to assemble to nominate candidates for elections.[3]

---

[3]The defendants argue that the plaintiffs challenged only the two sentences reporting that "critics of Silber also voiced suspicion that his supporters promoted the picket line to undercut the convention" and naming Lyons as one such supporter; the defendants urge us to confine our inquiry to the issue whether the publication of these two sentences gives the defendants a cause of action for libel. The plaintiffs argue in response that, in addition to challenging these two sentences, they have complained of the allegedly defamatory innuendoes of the article as a whole. Specifically, the plaintiffs urge us to read these two sentences together with Prado's statements, with the article's use of the word "hostage," with a sentence stating that the atmosphere surrounding the picketing became "ugly" as time passed, with the description of physical struggles between delegates and picketers, and with the statement that "Silber forces" at-

On October 9, 1990, the defendants moved to dismiss the complaint pursuant to Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974). A judge of the Superior Court held a hearing and, with the agreement of the parties, treated the defendants' motion as one for summary judgment pursuant to Mass. R. Civ. P. 56, 365 Mass. 824 (1974). The judge denied the motion and reported the "case" as well as ten questions of law with stipulated facts to the Appeals Court. See Mass. R. Civ. P. 64, 365 Mass. 831 (1974).[4] We transferred the case to this court on our own motion.

The defendants urge us to hold that the denial of their summary judgment motion was error because the challenged portions of the article constitute expressions of opinion protected by the First Amendment to the United States Consti-

---

tempted to "exploit" the picketing to eliminate the 15% rule. We agree with the plaintiffs. Their complaint plainly challenges the entire article. This is confirmed by the parties' stipulation of material facts, which indicates that plaintiffs alleged that the entire article — and "in particular" the two sentences mentioned above — defamed them.

[4]We note that, where a Superior Court judge takes action on a motion to dismiss or a motion for summary judgment, he or she need only report the propriety of the action taken. See *Heck* v. *Commonwealth*, 397 Mass. 336, 338 (1986). See generally *Cusic* v. *Commonwealth*, 412 Mass. 291, 293 (1992). Rule 64 "allows a judge to report an interlocutory finding or order if the judge believes that the finding or order 'so affects the merits of the controversy that the matter ought to be determined by the [A]ppeals [C]ourt before any further proceedings in the trial court.' " *Shabshelowitz* v. *Fall River Gas Co.*, 412 Mass. 259, 261 n.4 (1992), quoting Mass. R. Civ. P. 64, 365 Mass. 831 (1974). "Although a judge may report specific questions of law in connection with an interlocutory finding or order, the basic issue to be reported is the correctness of his finding or order. Reported questions need not be answered in this circumstance except to the extent that it is necessary to do so in resolving the basic issue." *McStowe* v. *Bornstein*, 377 Mass. 804, 805 n.2 (1979).

In the present case, the motion judge simply could have reported the correctness of his order denying the defendants' motion for summary judgment pursuant to the second sentence of rule 64. Rather, the judge reported ten questions of law together with the entire case pursuant to the third sentence of that rule — which applies to the report of a case on an agreed statement of facts without making a decision. Because the basic issue before us is the propriety of the judge's order, we shall exercise our discretion to treat this case as if that issue only had been reported to us. Cf. *Shabshelowitz, supra.*

tution, art. 16 of our Declaration of Rights, and the common law of this Commonwealth.

The plaintiffs argue in response that the challenged article implies that "NAGE and Lyons used their influence, brute force, and the police apparatus, and resorted to violence and intimidation in order to subvert the rules in an effort to prohibit the Democratic State Convention from taking place, all with the ultimate goal of illegally getting Silber on the ballot; not unlike the infamous 'Reichstag Fire.' " The plaintiffs also claim that the article accuses them of "subversive conduct" and of criminal acts exceeding "the level of atrocities committed by the Sandinistas." Such accusations, they contend, constitute actionable statements of defamatory facts. Relying in part on the decision of the United States Supreme Court in *Milkovich* v. *Lorain Journal Co.*, 497 U.S. 1 (1990), the plaintiffs contend that they have a cause of action for defamation even if we characterized the challenged statements as expressions of opinion.

In *National Ass'n of Gov't Employees, Inc.* v. *Central Broadcasting Corp.*, 379 Mass. 220, 227 (1979), cert. denied, 446 U.S. 935 (1980), we adopted the principles governing expressions of opinion set forth in § 566 of Restatement (Second) of Torts (1977). We held that "[a] defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." We explained that, under this rule, " '[a] simple expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is. But an expression of opinion that is not based on disclosed or assumed facts and therefore implies that there are undisclosed facts on which the opinion is based, is treated differently.' Thus if I write, without more, that a person is an alcoholic, I may well have committed a libel prima facie; but it is otherwise if I write that I saw the person take a martini at lunch and accordingly state that he is an alcoholic." *Id.* at 227-228,

quoting Restatement (Second) of Torts § 566 comment c, second par. (1977). See *Myers* v. *Boston Magazine Co*, 380 Mass. 336, 339 (1980).[5]

In order to receive protection under these principles, a challenged statement first must qualify as an expression of opinion. If "the statement unambiguously constitutes either fact or opinion," this issue is a question of law for the court to decide. *Myers, supra* at 339, quoting *Good Gov't Group of Seal Beach, Inc.* v. *Superior Court*, 22 Cal. 3d 672, 682 (1978), cert. denied, 441 U.S. 961 (1979). The court must "examine the statement in its totality in the context in which it was uttered or published. The court must consider all the words used, not merely a particular phrase or sentence. In addition, the court must give weight to cautionary terms used by the person publishing the statement. Finally, the court must consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published." *Fleming* v. *Benzaquin*, 390 Mass. 175, 180-181 (1983), quoting *Cole* v. *Westinghouse Broadcasting Co.*, 386 Mass. 303, 309, cert. denied, 459 U.S. 1037 (1982). See *Myers* v. *Boston Magazine Co., supra* at 341-342.

Applying these principles, we conclude that the statements challenged in the present case could be understood only as expressions of opinion and reasonably could not be construed as stating facts. The article stated that Silber critics "voiced suspicion" that his supporters had sought to undercut the convention. The word "suspicion," defined as the act of "suspecting . . . something wrong . . . without proof or on slight evidence," see Webster's Third New Int'l Dictionary 2304 (2d ed. 1959), plainly cautioned the reader that the article referred to a theory rather than to facts. The article discussed three alternative explanations for the picketers' mo-

---

[5] The rationale for this rule is that, where a statement of opinion is based on disclosed and nondefamatory facts, the communication itself indicates to its recipient that there is no defamatory factual statement. This result does not obtain in the case of an opinion based on undisclosed defamatory facts. See Restatement (Second) of Torts § 566 (1977).

tives, thereby confirming that the writer was engaging in speculation. Finally, the reported suspicion was uttered in the context of a heated political campaign and a labor dispute. The ordinary reasonable reader would be particularly skeptical of politically self-serving statements made in this context. See *National Ass'n of Gov't Employees, supra* at 229.[6]

We turn next to the issue whether the expressions of opinion found in the challenged article were based on disclosed nondefamatory facts or whether they implied "that there are undisclosed facts on which the opinion is based." *Id.* at 227, quoting Restatement (Second) of Torts § 566 comment c, second par. (1977). The article disclosed the following factual premises for the opinion that Lyons and NAGE promoted the picketing: Silber needed to obtain 15% of the votes in order to qualify for the Democratic party's primary ballot. Silber supporters did not feel entirely confident that he would meet this requirement, and he ultimately obtained only 15.46% of the vote. The cancellation of the convention might have eliminated the 15% rule. The police union disrupted the convention, thereby casting doubt as to whether it would be allowed to proceed. The police union was a member of NAGE. NAGE's national president supported Silber's candidacy.[7]

---

[6]Our conclusion that the challenged statements constituted expressions of opinion remains unchanged when we read the theory that Silber supporters promoted the picketing together with Prado's reference to the Sandinistas and with the use of such words as "hostage" or "brute force." These utterances readily fall into the category of mere vituperation and verbal abuse and reasonably could not be construed to state facts. See, e.g., *Fleming* v. *Benzaquin*, 390 Mass. 175, 181, 183 (1983) (words "dictators and Nazis" not statements of fact); *National Ass'n of Gov't Employees* v. *Central Broadcasting Corp.*, 379 Mass. 220, 229 (1979), cert. denied, 446 U.S. 935 (1980) (charge of "complicity in the atrocities of Solzhenitsyn's Gulag Archipelago" not a statement of fact regarding plaintiff). See also Restatement (Second) of Torts § 566 comment e (1977).

[7]On appeal, the plaintiffs dispute that Lyons and NAGE were supporters of Silber. The defendants argue in response that the plaintiffs conceded this fact in the summary judgment proceedings. In any event, as the defendants also argue, whether Lyons actually was a Silber supporter is immaterial. An opinion based on a disclosed nondefamatory factual state-

We hold that the challenged opinion, based on disclosed nondefamatory factual support, did not imply defamatory facts. See *King* v. *Globe Newspaper Co.*, 400 Mass. 705, 712-713 (1987), cert. denied, 485 U.S. 940 & 962 (1988). In *King*, the Boston Globe published an article stating that billboard industry officials had contributed to the plaintiff's gubernatorial campaign. The article detailed efforts by the Secretary of Transportation (a member of the plaintiff's administration) to protect and preserve certain billboards slated for removal. On the next day, the Boston Globe published an editorial suggesting that a resurgence of the billboard industry had occurred because "industry money finally reached what must be the right places." A cartoon describing a billboard on which caricatures of the plaintiff and of the Secretary of Transportation were shown holding bags of money appeared alongside the editorial. The billboard stated: "Ackerley billboards can put money in your pockets too!"

We rejected the plaintiff's contention that the editorial and the cartoon accused him of accepting bribes in return for his support of the billboard industry. We found that the cartoon was based on the facts disclosed in the article published on the previous day. We also found that the editorial was based on those facts and on the stated nondefamatory premise that public opinion opposed the billboard industry so that some other reasons for its resurgence had to exist. We held that the use of the word " 'apparently' made clear that the author of the statement is indulging in speculation, or at most, deduction." *Id*. at 713. The editorial, we concluded, "simply posed questions and suggested answers, as a matter of opin-

---

ment is not actionable even if the factual statement is false. *Fleming* v. *Benzaquin, supra* at 189-190. Describing Lyons as supporting Silber's candidacy is not defamatory. See Prosser & Keeton, Torts 773-774 (5th ed. 1984) ("while a statement that a person is a Republican may very possibly arouse adverse feelings against him in the minds of many Democrats, and even diminish him in their esteem, it cannot be found in itself to be defamatory, since no reasonable person could consider that it reflects upon his character").

ion, about the way public business was being conducted." *Id.* at 714.

In the present case as well, the challenged article clearly indicated to the reasonable reader that the proponent of the expressed opinion engaged in speculation and deduction based on the disclosed facts. See Restatement (Second) of Torts § 566 comment c, second par. The logical nexus between the facts and the opinion was sufficiently apparent to render unreasonable any inference that "the derogatory opinion must have been based on undisclosed facts." *Id.* The article's use of a cautionary term ("suspicion") reinforced the message that the expressed opinion implied no undisclosed and defamatory facts. See *King, supra* at 713. Finally, this conclusion was supported also by the fact that the challenged opinion appeared in an article devoted largely to reporting speculations as to the picketers' motives.

Thus, we hold that under established principles of Massachusetts law the challenged statements were not actionable. Accordingly, we conclude that the defendants' motion for summary judgment should have been allowed. Before we discharge this report, however, we pause briefly to examine the plaintiffs' argument that the decision of the Supreme Court of the United States in *Milkovich* v. *Lorain Journal Co.*, 497 U.S. 1 (1990), compels us to reach a contrary result.

We hold that nothing in *Milkovich* requires us to alter the principles of law which we have described today or their application to the facts of the present case. "Although the Supreme Court's discussion in *Milkovich* did not explicitly address statements reasonably viewed only as opinion because based on fully disclosed information, its reaffirmation of the line of cases represented by [*Greenbelt Coop. Publishing Ass'n* v. *Bresler*, 398 U.S. 6 (1970); *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL-CIO* v. *Austin*, 418 U.S. 264 (1974); and *Hustler Magazine, Inc.* v. *Falwell*, 485 U.S. 46 (1988)] confirmed that, to be actionable, a challenged statement must be understood as stating actual facts about an individual. That principle unquestionably excludes from defamation liability not only statements of rhetorical

hyperbole — the type of speech at issue in the *Bresler-Letter Carriers-Falwell* cases — *but also statements clearly recognizable as pure opinion because their factual premises are revealed. . . .* Both types of assertions have an identical impact on readers — neither reasonably appearing factual — and hence are protected equally under the principles espoused in *Milkovich.*" (Emphasis supplied; citation omitted.) *Phantom Touring, Inc.* v. *Affiliated Publications, Inc.,* 953 F.2d 724, 731 n. 13 (1st Cir.), cert. denied, 112 S. Ct. 2942 (1992). See The Supreme Court — Leading Cases, 104 Harv. L. Rev. 129, 219, 223-224 (1990) (Because the criteria used by lower courts to distinguish fact from opinion are consistent with *Milkovich,* the law of defamation will remain essentially unchanged).

Moreover, the rule protecting expressions of opinion based on disclosed or assumed nondefamatory facts is by now an integral part of our common law. See *Fleming* v. *Benzaquin,* 390 Mass. 175, 187 (1983). See also *Pritzker* v. *Brudnoy,* 389 Mass. 776, 778 (1983). While we have traced the "constitutional roots" of this rule to the First Amendment, e.g. *Myers, supra* at 338, such constitutional underpinning may be found also in art. 16 of our Declaration of Rights. "From the fact that we rest [a] decision wholly upon the Federal Constitution and its construction by the Supreme Court of the United States no inference should be drawn that the Declaration of Rights of the Constitution of this Commonwealth is less capable of protecting the essentials of freedom of speech, of the press, and of assembly than is the Federal Constitution. See arts. 16 and 19." *Commonwealth* v. *Gilfedder,* 321 Mass. 335, 343 (1947). Our cases protect expressions of opinion based on disclosed information because we trust that the recipient of such opinions will reject ideas which he or she finds unwarranted by the disclosed information. See note 5, *supra.* The constitutional principle on which our cases rely was articulated by Justice Holmes many years ago:

"[W]hen men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas — that the best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which their wishes safely can be carried out. That at any rate is the theory of our Constitution. It is an experiment, as all life is an experiment. Every year if not every day we have to wager our salvation upon some prophecy based upon imperfect knowledge."

*Abrams* v. *United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting). See *National Ass'n of Gov't Employees*, *supra* at 227, citing *Gertz* v. *Robert Welch Inc.*, 418 U.S. 323 (1974).

The suppression of ideas that would be occasioned by allowing the courts, rather than the "marketplace of ideas," to judge expressions of opinion such as those challenged in the present case is repugnant to this constitutional guarantee of free speech.[8]

In the seminal case adopting the common law rule described, we stated that although "it appears that our result is compelled by doctrines deriving ultimately from the First Amendment as interpreted by the Supreme Court . . . were it not constitutionally required, we would reach the same result, believing that the action is plainly without merit and the prospect of forcing the defendant to trial in such a case would put an unjustified and serious damper on freedom of expression" (footnote omitted). *National Ass'n of Gov't Employees*, *supra* at 233. Today as well, the independent protections of freedom of speech which are found in our common law and in art. 16 would lead us to reach the same result even if there existed no Federal constitutional support for the

---

[8]Contrary to what the plaintiffs argued, nothing in arts. 11 & 29 of the Massachusetts Declaration of Rights alters this conclusion.

principles which we applied. The report is discharged and the case is remanded to the Superior Court for entry of summary judgment for the defendants.

*So ordered*

APPENDIX.

## CONVENTION ENDORSES BELLOTTI
### Democrats put Silber on Ballot; Murphy 2d

Bruce Mohl
Frank Phillips
Globe Staff

SPRINGFIELD - The Democratic state convention, after being held hostage here for nearly four hours by the picket line of a pro-Republican police union, yesterday endorsed Francis X. Bellotti for governor and assured John Silber a place on the primary ballot.

Bellotti, 67, a former attorney general, won the party endorsement on the second ballot, upsetting Lt. Gov. Evelyn Murphy and driving Rep. John H. Flood (D-Canton) from the race for governor.

The convention, the first hurdle for Democrats headed for the Sept. 18 primary, was marked by behind-the-scenes lobbying by powerful party figures and charges of dirty tricks leveled at Republican Party leaders for trying to sabotage the gathering.

Silber, the self-styled outsider of the Democratic Party, relied heavily on the influence of Senate President William Bulger and other friends in the Senate to make it into the primary race against Bellotti and Murphy. He satisfied the party's 15 percent requirement on the first ballot, receiving 15.46 percent of the vote. He then withdrew his name from the competition and went home.

On the decisive second ballot, Bellotti won 51.4 percent of the votes cast, compared to Murphy's 40 percent. Flood was forced to drop out when he failed to win the needed 15 percent support on either ballot. He received 4.52 percent support on the first ballot and 8.6 percent on the second.

Sweat-soaked delegates operating under suffocatingly hot conditions on the convention floor late last night, also endorsed Attorney General James Shannon for reelection over Middlesex District Attorney Scott Harshbarger. Shannon took 58.7 percent of the vote, compared with Harshbarger's 41.3 percent.

In the treasurer's race, no candidate was endorsed on the first ballot. Sen. Richard Kraus (D-Arlington) and House Speaker George Keverian

were virtually tied at 38 percent apiece, while Rep. William Galvin (D-Brighton) came in third with 22.7 percent.

The race for lieutenant governor was also left undecided. Rep. Marjorie Claprood (D-Sharon) led with 37 percent of the vote, compared with 33 percent for Sen. William Golden (D-Weymouth) and 30 percent for Rep. Nicholas Paleologos (D-Woburn).

Shortly after 11 p.m., the few remaining delegates in the center voted to adjourn, endorsing no candidates in the treasurer and lieutenant governor races, thus allowing all the candidates for those two offices to go on the primary ballot.

All the balloting started nearly four hours late because most candidates and delegates refused to cross a picket line set up by off-duty Springfield police protesting the lack of a contract for the last 14 months. Scuffles broke out when some delegates crossed the lines, amid cries of "scabs" from the union members. Other delegates got into shouting matches with the picketers.

The convention went ahead only after the party won a court injunction against the police union, which endorsed George Bush for president in 1988.

Bellotti did not let the earlier chaos outside the convention hall put a damper on his late-afternoon endorsement. He savored his victory over Murphy, who had been predicting she would win. "I have been in a great many fights and a great many elections and I cannot ever remember a moment in my life where I have experienced a greater honor than this," said Bellotti, who was the party's nominee in 1964.

Silber breathed a sigh of relief after winning his 15 percent by a margin of 22 votes. "We were sweating blood. It was very, very close," Silber said after the vote.

The Boston University president credited his strong standing in the polls for the decision of the generally liberal delegates to give him a spot on the primary ballot, but later he conceded that the active support of Bulger and other senators was crucial in making the 15 percent cutoff.

Silber said the whole convention process was an "insider's game," but insisted he was no insider.

Murphy indicated she will run as the most liberal candidate of the three Democrats still in the governor's race. Flood said his first priority will be to find a job and indicated he probably will not support his three rivals.

"I suspect the Republican party will take advantage of what happened here today," Flood said of the picket-line confusion and his failure to make the primary ballot. "I haven't seen much leadership exercised here today."

Many Democrats angrily called for US Rep. Chester G. Atkins, the party chairman, to resign because of the police picket that postponed the start of the convention for hours. The confusion caused by the picket line was a major embarrassment for the Democrats, who appeared paralyzed and ineffective with the spotlight on them.

Atkins, however, said he suspected Republican party leaders were behind the picket line, especially White House aide Ron Kaufman. Atkins said he had no direct evidence of their participation but announced plans to investigate why "Kaufman's police" ignored an agreement not to picket the convention.

Atkins also rejected suggestions the Republicans will take advantage of the chaos that dominated the Democratic convention. "Say what you will about chaos and confusion, but it is the very nature of democracy," Atkins said.

Whether there would even be any voting yesterday was in doubt for much of the morning. As delegates arrived at the civic center, they learned that a deal between the Democratic State Committee and the Springfield police local to avoid a picket line had not held up. Mayor Mary Hurley had kept her part of the bargain by not speaking at the convention Friday night, but the police insisted she violated the agreement by just showing up inside the building.

Initially, the delegates seemed amused by being barred from the convention hall. They spread good-naturedly around the civic center, enjoying the sunshine and taking turns rallying for their favorite candidates.

But, as time went by and the temperature rose, tensions in the picket line increased dramatically. Many of the Democratic delegates resented the fact that their convention was being delayed by a union that endorsed George Bush for president in 1988 and approved an override of Proposition 2½ here.

"You wouldn't mind if this was a decent union, but this is a Republican group," said Phillip Johnston, the state's secretary of human services.

Shannon, mingling with delegates, said he thought honoring the picket line of a Republican-oriented union would not hurt the Democrats' image. "It's a union and Democrats don't cross picket lines," he said.

Many delegates said they suspected top Republican officials, in town for the convention, engineered the picket line as a political dirty trick. But White House aide Kaufman denied he had encouraged the police officers to picket the convention. "I'm totally innocent, but it was fun," Kaufman said.

Critics of Silber also voiced suspicions that his supporters promoted the picket line to undercut the convention. The Springfield police local is a member of the National Association of Government Employees, which is headed by Silber supporter Kenneth Lyons.

Sen. Michael Barrett of Cambridge, a liberal, crossed the picket line and went into the civic center. "These people are an embarrassment to organized labor and to the Democrats of Massachusetts," he said, referring to the police pickets just outside the entrance.

Luis Prado, executive director of La Alianza Hispana in Roxbury, said the situation was far worse than the February elections in Nicaragua, where he served as a United Nations monitor. "The Sandinistas never

dared to do anything like this," he said. "This is like using brute force in politics."

As the atmosphere turned increasingly ugly, hundreds of delegates started shouting, "Where's Bush now"? The union members responded by chanting, "In the White House."

Several delegates began moving toward the entrance of the civic center and the police pickets tried to cut them off. Some shoving and scuffling took place near the entrance. Charles C. Thomas, a delegate from Saugus, was slugged by one police officer with whom he was arguing. "It's high time the delegates just push their way in," Thomas said.

Uniformed Springfield police moved in to restore order, but in the process, delegate Michael Fogelberg of Boston was shoved to the side and thrown against a wall. Fogelberg said later that he plans to file a complaint against the Springfield police for using excessive force.

At 12:25 p.m., the police union's lawyer came out and informed the police officers that Superior Court Judge Patrick King had ruled that the picket line was illegal and should be moved off civic center property. The police pickets declared victory and moved off, but not before insisting that they had done nothing illegal.

"It's kind of strange that in a land that's supposed to be free, we can't exercise our free speech rights," said Robert Jacobson, president of Local 361. "We were not physically restraining anyone from going in."

During the standoff outside the convention hall, the politicians seeking to win the party's endorsements were huddling with party officials several block away on the 11th floor of the Sheraton Tara hotel, trying to decide what to do.

Bulger initially called on party chairman Atkins to shut down the convention and send everyone home. Top party officials refused to go along with the approach.

The Silber forces, nervous they would not be able to garner the 15 percent support needed to qualify for the primary ballot, tried to exploit the confusion caused by the police picket to do away with the 15 percent rule. The rule had been overwhelmingly endorsed by the party Friday night.

First, the Silber forces pushed for continuing the convention but suspending the rules to allow everyone a place on the ballot. Atkins and the campaigns of Silber, Flood and Murphy all agreed to suspend the rules, but Bellotti and several candidates for lesser offices insisted that the convention go ahead as planned.

Silber's forces prepared to file a motion to suspend the rules. Murphy and Flood were ready to stand with Silber on the motion until Murphy's delegates balked and the coalition fell apart. Bulger made one last attempt to block the 15 percent rule by appealing to Gov. Dukakis for help, but Dukakis turned him down.

In his speech to the delegates, Bellotti defended his insistence on proceeding with the balloting. "To have an agreement to exclude you from this hall would have made a mockery of this convention," he said.

<div align="right">

Curtis Wilkie of the Globe
staff contributed to this story.