Spurlock, J.
The plaintiff, Aristides J. Oritz (“Ortiz”) commenced this action against the defendants Time Warner, Inc., Liberty Media Corp., Edward O’Brien (“Mr. O’Brien”), and Patricia O’Brien (“Mrs. O’Brien") (collectively, “O’Briens”) alleging defamation. In September 2001, this court (Zobel, J.) granted summary judgment in favor of Time Warner, Inc., and Liberty Media Corp. This matter is before the court on the O’Briens’ motion for summary judgment pursuant to Mass.R.Civ.P. 56. For the reasons set forth below, the O’Briens’ motion is allowed.
BACKGROUND[2]
The undisputed facts viewed in the light most favorable to the non-moving party, as revealed by the summary judgment record, are as follows.
On October 1, 1997, a Middlesex County jury found the O’Briens’ seventeen-year-old son, Edward O’Brien, Jr., (“Eddie”) guilty of the first degree murder of his Somerville neighbor Janet Downing (“victim”) under a theory of extreme atrocity or cruelty. See Commonwealth v. O’Brien, 432 Mass. 578, 579 (2000). Immediately after hearing the verdict, the trial judge (McDaniel, J.) sentenced Eddie to a term of life imprisonment without the possibility of parole.
Courtroom Television Network (“Court TV”) broad-casted the proceedings relating to Eddie’s trial and conviction.
I. The Prosecution’s Case
During the trial, the prosecution[3] presented testimony by Somerville Police Lieutenant Charles Femino (“Femino”) who stated that there was a trail of blood on Hamlet Street, the street behind the victim’s house and the same route that Eddie had followed on the night of the murder. The prosecution also presented testimony from Somerville Police Sergeant James *767 Stanford (“Stanford”) regarding Stanford’s interview with Eddie and conversation with Mr. O’Brien on the night of the murder. Stanford testified on cross-examination that at the time of the interview and conversation, he did not consider Eddie to be a suspect in the victim’s murder. Robert Pino (“Pino”), a supervising chemist at the State Police Crime Laboratoiy, also testified for the prosecution, stating on cross-examination that Stanford had given him evidence concerning Eddie “right in the beginning” of his investigation. One of Eddie’s friends, John Fitzpatrick (“Fitzpatrick”) testified for the prosecution, stating that he saw Eddie near the crime scene on the night of the murder. On cross-examination, the defense attempted to establish that Fitzpatrick had made prior statements that were inconsistent with his testimony.
II. The Defense’s Case
Eddie’s defense counsel argued that the police had focused their investigation of the victim’s murder exclusively on Eddie, thereby failing to consider other possible murder suspects, namely Ortiz, the victim’s brother-in-law, who the defense argued had the motive[4] to commit the crime. To this end, the defense offered the testimony of Regina Mahoney (“Mahoney”), the victim’s neighbor. Mahoney testified that on the night of the murder, Ortiz asked if he could use her phone. The trial court judge did not allow Mahoney to testify that the victim had told her that ever since the victim had thrown Ortiz out of her house in March 1995 for dealing drugs, he acted with hostility towards her and she was afraid of him.[5] The defense also presented the testimony of Virginia Reckley (“Reckley”), the victim’s neighbor, who stated that she heard a noise from the victim’s stair area between 8:15 and 8:30 on the night of the murder. As this sound indicated the time that the victim was murdered, the defense argued that Eddie could not have committed the murder.[6]
III. Post-Trial Activity
On October 1, 1997, after Eddie had been sentenced to life in prison, the O’Briens were escorted from the courtroom by court officers because they were shouting profanities at the prosecutor. They left the courtroom at approximately 3:28 p.m. A group of reporters met the O’Briens just outside the courthouse, asking them what they thought and how they felt about the trial. Court TV and other television networks recorded their statements and broadcasted them live.
At this press conference, the following exchange occurred (“Press Conference Comments”):
Ms. O’Brien: I’m telling you, this has been a frame-up from day one. Our son did not do this crime and that Mr. Reilly, his political career was on the line, and that’s all he cared about. And I don’t knowhow that man sleeps at night. I’ll tell you.
Mrs. O’Brien: Thisher son was in the house when she went down the stairs. You heard the testimony of the neighbor that heard her go down the stairs at 8:15. Artie Ortiz’s cab had to be towed from Hamlet Street where the blood drops .were going down the hill. The judge would not allow that to get out in court.
Reporter: Who are you saying did it?
Mr. O’Brien & Mrs. O’Brien: Artie Ortiz.
Mr. O’Brien: And if anybody can’t see that, they’re blind
Mrs. O’Brien: Okay . . .
Mr. O’Brien: She threw him out of the house three months before this because he was selling drugs in the house, but they won’t allow that testimony in there? Give me a break.
Background voice: What about the woman who spent the last 10 hours with [unintelligible] testimony . . .
Mrs. O’Brien: Ten hours of her life was [sic] spent on the porch with Gina Mahoney.
Mr. O’Brien: Our son, 15 years old, I mean, give me a break. He did this in 10 minutes? Ten minutes he killed her, dressed her, re-dressed her, cut her throat? Give me a break.
Mrs. O’Brien: Changed.
Reporter: Why didn’t he go to the stand and say this?
Mr. O’Brien: He’s 17 years old. You want this Reilly, lying son of a b**** . . .
Background voice: I was on the stand and they wouldn’t let me say it.
Mr. O’Brien: This is a joke. This is a joke. Mr. Reilly should be ashamed of himself.
Background voice: They wouldn’t let me tell what Janet spent 9 hours telling me.
Mr. O’Brien: These cops lied on the stand. It was proven they lied on the stand, okay?
Background voice: They stopped me from testifying
Mr. O’Brien: You had Stanford and that Femino in there lying to death.
Mrs. O’Brien: Why didn’t. . .
Mr. O’Brien: Mr. Pino gets on the stand and says that they were lying, but what does that mean? Two police officers get up there and lie on the stand. They gave a black eye to every good policeman in this state, and they should be ashamed of themselves to put a 15 year old kid away for life. But it’s not over. We’ve got the appeal, and I’m telling you right now I will die before my son spends any more time in jail than he has to after this.
Reporter: Can we get a reaction from Patricia, Mrs. O’Brien?
*768 Mrs. O’Brien: What we saw what he did to John Fitzpatrick and how he changed his testimonyyou think our son was going to go on the stand and let the likesthe evil little man of Mr. Reilly get on that stand and rip my son apart? No.
Reporter: Patricia, beyond the question of whether Eddie should testify, I just want. . . it’s been more that two years, your reaction
Mrs. O’Brien: Artie Ortiz, Artie Ortiz murdered Janet Downing. He was involved . . .
Attorney: That’s it folks . . . that’s it folks .. [7]
DISCUSSION
Summary judgment is granted where there are no genuine issues of material fact and where the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Corr., 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving patty may satisfy this burden either by submitting affirmative evidence negating an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of its case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). The opposing party cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment. LaLonde v. Eissner, 405 Mass. 207, 209 (1989). “(SJummaryjudgment procedures are especially favored in defamation cases.” King v. Globe Newspaper Co., 400 Mass. 705, 708 (1987), citing Godbout v. Cousens, 396 Mass. 254, 258 (1985).
“The determination whether a statement is a factual assertion or an opinion is a question of law if the statement unambiguously constitutes either fact or opinion. However, the determination whether a statement is a factual assertion or is a statement of pure opinion is a question of fact if the statement reasonably can be understood both ways.” Id. at 709 (internal citations omitted). In making this determination, the court must examine the totality of the circumstances surrounding the challenged statements, including the context of the statements, “[any] cautionary words used[,] . . . the medium by which the statement is disseminated and the audience to which it is published.” Lyons v. Globe Newspaper Co., 415 Mass. 258, 263 (1993) (quotations omitted).
A statement that is a “pure” opinion is one that is based on disclosed or assumed nondefamatory facts and is, by itself, not actionable no matter how unjustified and unreasonable the opinion may be or how derogatory it is. Pritsker v. Brudnoy, 389 Mass 776, 778 (1983) (quotations omitted); see Lyons, 415 Mass. at 262; Tech Plus, Inc. v. Ansel, 2003 WL 21977215 *8 (Mass.App.Ct. Aug. 21, 2003) (holding, “it is well settled that a statement of opinion is nonactionable if it is drawn from a disclosed fact that is either true or nondefamatory, regardless of whether the opinion was justified, so long as the statement does not imply the existence of other, undisclosed facts that are both false and defamatory”). “The rationale for this rule is that, where a statement of opinion is based on disclosed and nondefamatory facts, the communication itself indicates to its recipient that there is no defamatory factual statement. This result does not obtain in the case of an opinion based on undisclosed nondefamatory facts.” Lyons, 415 Mass. at 263 n.5; see Standing Comm. v. Yagman, 55 F.3d 1430, 1439 (9th Cir. 1995) (holding “rationale behind this rule is straightforward: When the facts underlying a statement of opinion are disclosed, [listeners] will understand they are getting the [speaker’s] interpretation of the facts presented; they are therefore unlikely to construe the statement as insinuating the existence of additional, undisclosed facts”).
A “mixed” opinion is an opinion that is based on facts regarding the plaintiff or his conduct that have not been stated by the defendant or assumed to exist by the parties to the communication. Pritsker, 389 Mass. at 778. A mixed opinion statement is actionable if the comment is understood as implying the existence of undisclosed facts about the plaintiff that must be defamatory in character in order to justify the opinion. Id.
In this case, the O’Briens’ Press Conference Comments included several disclosed facts, including the following statements:
Mr. O’Brien: Thisher [the victim’s] son was in the house when she went down the stairs. You heard the testimony of the neighbor that heard her go down the stairs at 8:15. Artie Ortiz’s cab had to be towed from Hamlet Street where the blood drops were going down the hill. The judge would not allow that to get out in court.
Mr. O’Brien: She threw him [Ortiz] out of the house three months before this because he was selling drugs in the house, but they won’t allow that testimony in there [court]? Give me a break.
Background voice: What about the woman who spent the last ten hours with [unintelligible] testimony.
Mrs. O’Brien: Ten hours of her life was [sic] spent on the porch with Gina Mahoney.
Background voice: I was on the stand and they wouldn’t let me say it.
*769 Background voice: They wouldn’t let me tell what Janet spent 9 hours telling me.
Mr. O’Brien: The cops lied on the stand. It was proven they lied on the stand, okay?
Background voice: They stopped me from testifying
Mr. O’Brien: Mr. Pino gets on the stand and says that they were lying, but what does that mean? Two police officers get up there and lie on the stand . . .
Specifically, the O’Briens disclosed that the trial court judge had excluded evidence that placed Ortiz’s cab on the street where blood drops had been found; that the trial judge had excluded testimony that the victim had thrown Ortiz out of her house three months before her murder; and that the police officers who had testified admitted on the stand that they were lying. These disclosed facts, combined with the fact that the average listener would assume that the O’Briens also based their Press Conference Comments on the trial they had watched, weigh heavily in the court’s decision that the O’Briens’ Press Conference Comments were pure opinions.
Moreover, the context of the statements contributes to a finding that the Press Conference Comments were pure opinion. See Lyons, 415 Mass. at 263. The O’Briens had just exited the courtroom where their seventeen-year-old son had just been convicted of first degree murder and sentenced to life in prison. The O’Briens were thus legitimately overcome with emotions, thereby overriding the absence of any cautionary words such as, “I believe,” or “I think.” See id. Court TV had also broadcasted Eddie’s trial, thus the audience listening to the O’Briens’ Press Conference Comments understood the context.
For example, in Pritsker, the plaintiffs, owners of a restaurant, alleged that comments that the defendant made on his call-in radio show were defamatory. 389 Mass. at 776. Specifically, the challenged statements included, “the people who own the [restaurant] are unconscionably rude and vulgar people. And the attitude they communicate is awful . . . The food is fine, the people who run it are PIGS.” Id. at 777-78 (footnote omitted). The court found that the average listener of the defendant’s radio show would not reasonably conclude that the defendant’s comments were based on undisclosed defamatory facts. 389 Mass. at 779. Rather,
the average listener would assume that [the defendant’s] comments were based only on his observations of conditions at the restaurant, such as its service, decor, and atmosphere, and would regard his comments simply as his opinion of conditions which he, as a professional restaurant critic, found unsatisfactory or distasteful and which he reasonably attributed to the owners of the restaurant.
Id. at 780 (footnote omitted). The court therefore concluded that the defendant’s comments were pure opinion, “based on partly disclosed and partly assumed facts,” and therefore not actionable. Id. In this case, given that the audience had presumably just watched the outcome of Eddie’s trial on television, the audience could reasonably conclude that the O’Briens’ statements were based on disclosed facts.
For the statements to be characterized as “pure opinion,” however, the disclosed and assumed facts must also be nondefamatory. “Words may be found to be defamatory if they hold the plaintiff up to contempt, hatred, scorn, or ridicule, or tend to impair his standing in the communi1y[.]” Eyal v. Helen Broad. Corp., 411 Mass. 426, 429 (1991), quoting Poland v. Post Publ’g Co., 330 Mass. 701, 704 (1953); Correllas v. Viveiros, 410 Mass. 314, 319 (1991) (holding, “[d]efamation is the publication of material by one without a privilege to do so which ridicules or treats that plaintiff with contempt”). “To succeed ... on an action for defamation, a plaintiff must additionally show that the alleged defamatory statement published by the defendant was ‘of and concerning’ the plaintiff.” Eyal, 411 Mass. at 429, citing New York Times Co. v. Sullivan, 376 U.S. 254, 288 (1964). “Statements made in the course of a judicial proceeding which pertain to that proceeding are, [however], absolutely privileged and cannot support a claim of defamation, even if uttered with malice or in bad faith.” Correllas, 410 Mass. at, 319, citing Seelig v. Harvard Coop. Soc’y, 355 Mass. 532, 538 (1969).
At Eddie’s trial, the defense proffered Mahoney’s testimony that she had had a conversation with the victim at which time the victim told Mahoney that she was afraid of Ortiz because he had been acting wfith hostility towards her ever since she had thrown him out of her house. This proffered and ultimately excluded testimony was made in the course of a judicial proceeding. Therefore, this testimony is privileged and, consequently, nondefamatory. Similarly, the disclosed and assumed facts relating to the trial itself are also privileged and nondefamatoiy as they directly relate to a judicial proceeding.
The O’Briens’ Press Conference Comments are therefore pure opinion rather than factual assertions, and they are not actionable. See King, 400 Mass. at 709. Accordingly, the O’Briens’ motion for summary judgment is allowed,
ORDER
Accordingly, for the foregoing reasons, the O’Briens’ motion for summary judgment is ALLOWED.

With one exception, Ortiz agrees with all of the undisputed facts set forth by the O’Briens.

The lead attorney for the prosecution was Thomas Reilly who was, at the time, the Middlesex County District Attorney.

The O’Briens contend that, at Eddie’s trial, the defense introduced evidence suggesting that Ortiz had the intent and opportunity in addition to the motive to commit the murder. Oritz claims that defense counsel offered evidence regarding motive alone.

Although Ortiz agrees that the defense attempted to offer Mahoney’s testimony to this effect, he claims that he and his family lived with the victim temporarily while they looked for permanent housing: the victim never evicted him or asked him to leave her home; he never sold drugs when he lived in the victim’s home; the victim never accused him of dealing drugs from her home; and he did not have any involvement in her killing.

In the transcript from the twelfth day of trial, included as Exhibit 10 of the O’Briens’ summary judgment record, Eddie’s attorney argued in his closing argument that at 8:15 on the night of the murder, Eddie was in front of his house playing with a fake ID with two other individuals.

Timothy Sullivan, the Executive Producer/Daytime of Court TV, authenticated the transcript of the O’Briens’ Press Conference Comments, restated here, in his affidavit attached to Ortiz’s opposition to the O’Briens’ summary judgment motion.