Gants, J.
The plaintiff Mark A. Carozza (“Carozza”) has filed a complaint against his former employer, the defendant Blue Cross and Blue Shield of Massachusetts, Inc. (“Blue Cross”), alleging that Blue Cross:
1. terminated him because he rejected his supervisor’s sexual advances, in violation of G.L.c. 15 IB, §§4(1) and 4(16A);
2. discriminated against him on the basis of his gender (male) and sexual orientation (heterosexual) in the conditions of his employment by creating a hostile work environment, in violation of G.L.c. 151B, §§4(1) and 4(16A);
3. terminated him in retaliation for his opposition to the alleged sexual harassment, in violation of G.L.c. 15IB, §§4(4) and 4(4A); and
4. through its agent, defamed him by making false statements that he was a dangerous person.[1]
Blue Cross has moved for summary judgment as to all four claims. After hearing, for the reasons detailed below, Blue Cross’s motion for summary judgment is ALLOWED in part and DENIED in part.
BACKGROUND
In evaluating a motion for summary judgment, this Court must rely on facts not in dispute as well as disputed facts viewed in the light most favorable to the nonmoving party. Beal v. Board of Selectmen of Hingham, 419 Mass. 535, 539 (1995). Consequently, the facts stated below are presented in the light most favorable to Carozza and should not be misunderstood as findings of the Court.
Carozza was initially hired by Blue Cross in January 1994 as a temporary employee through an agency called TAC Temporaries, and was assigned to work in Blue Cross’s Federal Employee Program (“FEP”) unit in Rockland, Massachusetts. In October 1994, he became a permanent employee of Blue Cross, continuing to be assigned to the FEP unit in Rockland as a Claims Associate, where he remained until he was terminated on July 2, 1997.
*89 During the period of Carozza’s employment with Blue Cross, there were approximately 55 employees within his work unit. Of these, approximately 48 were women and three were openly gay men. While employed by Blue Cross, Carozza reported to various “team leaders” and had various supervisors, all of whom were women. Carozza is a heterosexual male and was perceived as such by his supervisors and his co-workers within FEP.
When Carozza applied for work as a temporary employee, he was interviewed by Melissa Petchell (“Petchell”), who later became his supervisor, and Steve Derose (“Derose”), an openly gay co-worker. After Carozza was hired for the temporary position, Petchell told him that she did not think that he was really qualified for the job, but that she had hired him because Derose liked him.
In or around the spring of 1994, while at work, Petchell asked Carozza to come to her desk and showed him photographs of Derose. In some of these photographs, Derose was wearing colored underwear; in others, he was wearing woman’s clothing; in others, he was displaying his physique in a bodybuilding competition at the 1994 Gay Games.
Also in 1994, while Carozza was still a temporary employee, Petchell made it clear to Carozza that if he wished to stay in her good graces, he had to be her “coffee boy.” Petchell frequently and regularly required Carozza to go out and buy coffee for her and ice cream and birthday cakes for the office. Petchell also required Carozza to buy cartons of cigarettes for her at wholesale prices from the PX at the South Weymouth Naval Air Station, where Carozza, a U.S. Marine Corps veteran, had privileges. Running such errands was not part of Carozza’s job duties. Female and gay male co-workers were not required to perform such tasks during work hours. When Carozza complained to Petchell about having to be her “coffee boy,” she told him that she had gotten him the job and that he would not be there if it had not been for her. On another occasion in 1994 when Petchell ordered Carozza to fetch coffee for her and he refused, Petchell told Carozza, “I’ll remember that.”
On or about June 29, 1994, Petchell and Deidre Carbonneau (“Carbonneau”), a team leader in the FEP unit, drafted a farcical letter of recommendation on Blue Cross letterhead regarding another heterosexual male employee, Vladimir Cuellar (“Cuellar”). One sentence in the letter stated, “[H]e and another very special employee, Mr. Mark Carozza, Lt. First Date, pardon me, I mean Mate; went to B.J.’s for six hours in order to purchase a cake. This cake finally arrived after the termination of the intended recipient.” (Emphasis in original.)
In December 1994, after he became a permanent employee, Carozza attended a Blue Cross office Christmas party. At the party, a Blue Cross employee named Christine McCarty (“McCarty”), who later was to become his team leader, asked him to dance, bought him drinks, and put her hand on his shoulder. He declined McCarty’s offer to dance. After May 1996, when McCarty became his team leader, she placed her hands on his shoulders and massaged them. He asked her to stop and she did. In the remaining months of his employment at Blue Cross, she rubbed his shoulders once or twice more. He again asked her to stop, and she did.
On or about October 4, 1996, a female co-worker named Alta Jean Louis “awarded” Carozza a document entitled “Certificate of Upgrade to Perfect Asshole.”[2] Carozza understood that this was intended as a joke and was a nationwide form letter in which only the name of the recipient was added, but he was embarrassed and not amused by it. The document was circulated among his co-workers in the office. He believed this to be discrimination against him as a male because he was one of the only men in the unit, but he admitted that he was the only male in the unit to receive it.
One month later, on or before November 4, 1996, an openly gay employee by the name of Kevin Couglar (“Couglar”) called out Carozza’s first name to get his attention and then made the obscene gesture of grabbing his own crotch. Carozza complained about Couglar’s behavior. Late in the afternoon of November 4, 1996, a co-worker from the Blue Cross Blue Card Program named Arlene walked by his cubicle several times and called out to him in the presence of co-workers, “Hey, sleaze ball!” She then stepped into Carozza’s cubicle, slapped him on the back of his neck and head, and proceeded to berate him for being intolerant of Couglar. She later went to team leader Carbonneau to report that Carozza was becoming angry. Carbonneau approached Carozza, ostensibly to pacify him, but also to share in Arlene’s criticism of Carozza.[3]
The next day, November 5, 1996, Couglar approached Carozza at his desk and told him, “Not only do the gays put you down, but so do the women.” On November 6, 1996, another co-worker, Carol Callahan, told Carozza that Couglar was going about the office bragging to female co-workers and gay coworkers about having taunted Carozza.
On another occasion Couglar stated to Carozza: “I thought you were gay. I could make you gay.” Another time, Carozza heard Couglar call out to a male coworker, Mark Mosca ("Mosca”), who has young children, “Hey, breeder!” On yet another occasion, Carozza heard Couglar say to Mosca, “If you were a little heavier and a little balder, I’d chase you all over this building.” On a separate occasion, Couglar stood up on his chair or desk in the common work area for claims processors and shouted, “I’m gay and I’m proud of it!” Carozza told Couglar to stay away from him. He also asked his supervisors to keep Couglar away from him and make Couglar improve his conduct. They did not.[4]
*90 In December 1996, Blue Cross employees and supervisors participated in a “Santa Swap.” Couglar was assigned to swap gifts with a co-worker named Cheryl Thomas. Couglar gave her a Ken doll, the male counterpart to a Barbie doll, and dressed the Ken doll in Barbie clothing, all of which was wrapped in gift-paper containing photographs of nude men.
On or about April 15, 1997, while Carozza was working overtime, he was talking to somebody when McCarty, who was speaking with Couglar, asked Carozza to get back to work. Around this same time, McCarty threatened him with a bad performance review if he did not get coffee for her. Also that month, again while Carozza was working overtime, McCarty interrupted her personal conversation with Couglar to order Carozza to get pizza and deliver it to her and others in the office. Carozza refused. In the presence of Couglar, McCarty reminded Carozza, “Your review is tomorrow.” Moments later, McCarty called Carozza at his desk and asked him why he had not yet gone for the pizza. To avoid receiving a bad review, Carozza agreed to go for the pizza.
In April or May of 1997, another co-worker, Candy Comeletti, told Carozza, “We [the women in the office] can do everything better than you and more.” When Carozza disagreed, she told him, “I’ll slap you in the face right now.”
On a Friday afternoon in April 1997, during a casual dress day at the office, Couglar walked around the office wearing a bra on the outside of his dress shirt. He stopped in front of Carozza in this garb.
In 1997, Couglar discussed his “sexual escapades” with other co-workers in the unit room. Although Couglar was not speaking to Carozza, Carozza could hear Couglar’s description, as could anyone who was in the room. In his verified complaint, Carozza attested that this incident occurred in “approximately May and June 1997,” but in his deposition he recalled only that it occurred in 1997 and had no recollection of which month. He also had no recollection of where Couglar had this conversation within the unit room, or of how far away he was from Carozza.
Although he was supposed to be reviewed by April 24, 1997, Carozza did not receive his performance appraisal from McCarty until May 1997. On the elements of quality, quantity, and job knowledge, Carozza received a rating of “meets expectations” despite the fact that he was always given the highest grade of 100% on his quality performance sheets. On the elements of teamwork/collaboration and initiative, he received a rating of “needs improvement.” Carozza was not informed at that time as to whether he would receive a raise on the basis of the review, although he believed that others had been told.
On Saturday, June 14, 1997, while working overtime, Carozza took a 15 minute break to attend to some personal business. McCarty, who was the acting supervisor that weekend for all overtime employees, yelled to Carozza, “I hope you’re taking this out of your hours!” Carozza shouted back, “Yes, but not my break time.” Meanwhile, McCarty did not reprimand female customer service representatives under her supervision who were spending their Saturday overtime hours planning a going away party for another supervisor. Other female employees went outside to take cigarette breaks or talked on the telephones to their boyfriends during the overtime hours. None of these employees were reprimanded by McCarty.
On June 16, 1997, Carozza sent McCarty an interoffice e-mail demanding to be told what, if any, pay increase he would receive for 1997. McCarty did not respond to the e-mail. That same day, Carozza called a 1 -800 telephone number that Blue Cross had established as a “help line” for personal problems that employees did not want management to know about. He spoke with Terri Ireton (“Ireton”), who worked in Blue Cross’s human resources department in Boston, to complain about not having been informed by McCarty of a pay increase and other issues concerning what he characterized as unfair and discriminatory conduct in the workplace. Ireton referred Carozza to Susan Council (“Council”), who worked in human resources for Blue Cross in its Rockland office.
Carozza and Council met for the first time on the afternoon of June 16, 1997. Council informed Carozza that everything he said to her would be in confidence, thus encouraging him to speak freely about workplace issues that were troubling him. He discussed with her his complaints about his performance review and the alleged sexual harassment. He also showed her a copy of a formal sexual harassment complaint that he said he intended to file with “the AG’s office.” During their discussion that day, Council asked Carozza to name three women who have done good things for the United States of America, and to name any women he considers to be his heroes.
On June 18, 1997, McCarty told Carozza that he would receive a two percent pay increase. That same day, Council wrote a memorandum to two of her colleagues in Blue Cross’s human resources department — Ireton and Greg DeCenzo (“DeCenzo”). In this memorandum, she wrote:
. . . I’m concerned about everything I saw when I met with him. This is a VERY angry man, an ex-Marine, looking for a job where he will carry a gun.[5] He has enormous disrespect for women and for his leaders — we had an extensive conversation about that.
(Emphasis in original.)
In a later memorandum to DeCenzo about Carozza dated' June 27, 1997, Council added these observations about her meeting with Carozza on June 16, 1997:
. . . He presents with enormous anger, hatred of women, a highly rigid understanding of how busi *91 ness should operate, a pronounced devotion to hierarchy, and an absolute expectation that he will be promoted to Customer Service ... I contact Terri and Greg to express great concern about this associate’s volatility and about resulting workplace safety. We set precautions in motion . . .
On June 24, 1997, Beverly English (“English”) was the acting supervisor in Carozza’s unit, covering for McCarty. Carozza was at his desk during his lunch break using his personal laptop computer. English approached him and asked him what he was doing. Carozza told her he was working on his computer during his lunch break. English then informed Carozza, in the presence of his co-workers, that other employees had come to her with the concern that Carozza had been working on his laptop while on the clock. Carozza responded, “I told you that I was on lunch, and who are these associates?” English refused to tell him. Carozza then asked English, “Are we all set here?” English stated, “Yes.” Carozza then said, “You shouldn’t mention hearsay unless you can báck it up with names. That’s all I have to say.” English subsequently wrote a memorandum regarding the incident in which she accuses Carozza of angrily using the “F” word several times in their conversation.
On June 25, 1997, on the basis of English’s accusations, Blue Cross suspended Carozza indefinitely with pay. On July 2, 1997, Council and DeCenzo informed Carozza by telephone that Blue Cross had decided to fire him because he swore at a supervisor.
On December 2, 1997, Carozza filed a Charge of Discrimination against Blue Cross with the Massachusetts Commission on Discrimination (“MCAD”). He filed his verified complaint in this case on March 20, 2000.
DISCUSSION
To prevail on summary judgment, the moving party must establish that there are no genuine issues of material fact as to any element of a claim and that it is entitled to judgment as a matter of law on that claim. See Mass.R.Civ.P. 56(c); Highlands Insurance Co. v. Aerovox, Inc., 424 Mass. 226, 232 (1997). Where, as here, the party opposing summary judgment has the burden of proof at trial, the moving party is entitled to summary judgment if it “demonstrates, by reference to material described in Mass.R.Civ.P. 56(c), unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party’s case." Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). “To be successful, a moving party need not submit affirmative evidence to negate one or more elements of the other party’s claim.” Id. It is sufficient to demonstrate that “proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991).
Since each of Carozza’s four claims raise separate issues, this Court will consider each claim in turn.
Quid Pro Quo Gender Discrimination: Termination Because of His Alleged Rejection of McCarty’s Sexual Advances
In evaluating whether a discrimination claim under Chapter 15 IB survives summary judgment, Massachusetts courts use the same three-stage analysis originally devised by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to address Title VII discrimination claims. Wynn & Wynn, P.C. v. Massachusetts Commission Against Discrimination, 431 Mass. 655, 665 (2000); Blare v. Husky Injection Molding Systems Boston, Inc., 419 Mass. 437, 440 (1995). In the first stage, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. Blare, 419 Mass, at 441. Once the prima facie case is established, the plaintiff enjoys a presumption of discrimination that entitles the plaintiff to judgment unless and until the defendant rebuts the presumption “by articulating a legitimate, non-discriminatory reason for its hiring decision.” Id. Once the defendant satisfies this burden of production, the presumption vanishes, and the plaintiff bears the burden of persuasion at the crucial third stage to establish either that the employer’s articulated reason was a pretext or that the actual reason for the hiring decision was discrimination. Id. at 444.
In traditional employment discrimination cases, as here, where the plaintiff has been terminated and the discrimination case rests on circumstantial evidence, the first stage showing of prima facie discrimination generally is satisfied by proving four elements:
1.the plaintiff belongs to a class that is protected by G.L.c. 15 IB;
2.he performed his job acceptably;
3.he was terminated; and
4. "his employer sought to fill the plaintiffs position by hiring another individual with qualifications similar to the plaintiffs."
Id. at 441; Wynn & Wynn, P.C., 431 Mass. at 665. In Blare, however, the Supreme Judicial Court observed that “the elements of the plaintiffs initial burden may vary depending on the specific facts of a case.” Blare, 419 Mass. at 441. This Court finds that the fourth element of the prima facie case must be altered in view of the specific facts presented in this case.
Under the three-stage McDonnell Douglas analysis, the plaintiff can defeat summary judgment if he simply presents evidence sufficient to prove his prima facie case, and there are disputed issues of fact as to the contrary evidence produced by the defendant. Indeed, at trial, if the plaintiff proves only his prima facie case and the defendant offers no contrary evidence, the jury is permitted to find that the employer terminated the employee because of unlawful discrimination. See Lipchitz v. Raytheon Company, 434 Mass. 493, 501 (2001). The prima facie case is sufficient, by itself, to *92 warrant such a result because it “ ‘eliminates the most common nondiscriminatory reasons for the plaintiffs rejection,’ . . . thereby creating a presumption of discrimination.” Blare, 419 Mass. at 441, quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981).
In Blare, which involved an allegation of age discrimination, the Supreme Judicial Court found that the prima facie case had been satisfied because Blare was 57 years old, had for seven years prior to his termination received consistently good performance reviews, and his duties following his termination were performed by employees who were under 40 years old. Blare, 419 Mass, at 446. Such findings, if unchallenged, reasonably permitted the presumption that he was terminated because of his age.
In the instant case, however, the four usual elements of the prima facie case do not reasonably create such a presumption. In a gender discrimination case like this one, every plaintiff belongs to a class protected by G.L.c. 151B, whether the plaintiff be male or female, heterosexual or homosexual. Melnychenko v. 84 Lumber Company, 424 Mass. 285, 289 (1997). Therefore, it is not as if the plaintiff, as a male heterosexual, belongs to a traditional suspect class that has historically suffered from discrimination. Focusing only on the first three elements of the prima facie case, the termination of a male heterosexual who was performing his job adequately does not reasonably permit a presumption that the termination was based on his gender or his sexual preference.
If the traditional fourth element were that his duties following his termination were performed by a woman or a gay male, then a presumption that his termination was based on his gender or his sexual preference may be reasonable. However, the Supreme Judicial Court has recently declared that the plaintiff in a case like this is not required to establish as part of his circumstantial prima facie case that the employer filled the position with a woman or a gay man. See Wynn & Wynn, P.C. v. Massachusetts Commission Against Discrimination, 431 Mass. at 665 n. 22. Rather, the plaintiff meets his burden as to this traditional fourth element of the prima facie case by furnishing evidence that the employer filled the position with another person with similar qualifications, even if the replacement is another heterosexual male. This traditional fourth element adds virtually nothing to the strength of the presumption. The fact, if proven, that Carozza’s duties were performed after his termination by another heterosexual male with similar qualifications does not reasonably add weight to the inference that gender was a motivating cause of his termination. Indeed, if anything, it would permit a reasonable inference that gender was not the motivating cause, because, if it were, one reasonably would infer that Carozza’s employer would not replace him with another heterosexual male. Where, as here, the employer’s articulated basis for termination is not performance or qualifications, but insubordination, this traditional fourth element adds absolutely nothing because the employer does not contend that the plaintiff was terminated for any reason that had to do with his qualifications.
Since, under the circumstances of the instant case, the traditional fourth element, as interpreted by the Supreme Judicial Court, is irrelevant to any rational analysis of whether there is a presumption of discrimination, this Court will replace it with another element that is relevant to that analysis under the circumstances of this case. Carozza alleges that he was terminated from employment because of his alleged rejection of what he characterizes as McCarty’s sexual advances. This contention can be true only if McCarty initiated or participated to some degree in the decision to terminate him. Therefore, this Court finds this to be the appropriate fourth element of Carozza’s prima facie case of discrimination regarding his termination. If Carozza can establish that he was performing his job adequately, that he was terminated by Blue Cross, and that McCarty participated in some fashion in the decision to terminate him, then it is reasonable from those facts alone to reach a presumption of gender discrimination. If McCarty did not initiate or participate in the decision, then it is not reasonable to presume that he was fired because he resisted McCarty’s alleged sexual advances.
There is no evidence in the summary judgment record that McCarty initiated or participated in any way in the decision to terminate Carozza. Viewing the evidence in the light most favorable to Carozza, McCarty on three separate occasions massaged Carozza’s shoulders after she became his team leader in May 1996, and stopped each time after Carozza asked her not to. Even if one were to assume that these events happened and that they were intended as sexual advances, there is no evidence that his termination on July 2, 1997 had anything to do with Carozza's rejection of them. McCarty did not initiate the process to terminate him, which commenced after Carozza’s verbal quarrel with the acting supervisor who was covering for McCarty in her absence — Beverly English. Nor is there any evidence that McCarty participated in any meetings regarding his termination or discussed his possible termination with anyone from the Human Resources Department. She testified that she had no such discussions and did not even know at the time why he was being terminated, and there is no evidence to the contrary. Nor can Carozza even recall when McCarty tried to massage his shoulders, so there is no evidence that the last instance occurred at or about the time of his termination. In short, there is not evidence in the summary judgment record that McCarty had anything to do with his termination; nor does the record reveal circumstances that reasonably permit such an inference. Without evidence of this fourth element of Carozza’s prima facie case of discrimina *93 tion, his claim that his termination was caused by gender discrimination cannot survive summary judgment.[6]
Discrimination on the Basis of Carozza’s Gender (Male) and Sexual Orientation (Heterosexual) in the Conditions of His Employment Through the Creation of a Hostile Work Environment
Carozza also claims that he was sexually harassed and discriminated against on the basis of his gender and sexual orientation in the conditions of his employment through the creation of a hostile work environment. “A hostile work environment is one that is ‘pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization, [and that] poses a formidable barrier to the full participation of an individual in the workplace.’ ” Cuddyer v. The Stop & Shop Supermarket Company, 434 Mass. 521, 532 (2001), quoting College-Town v. Massachusetts Commission Against Discrimination, 400 Mass. 156, 162 (1987). See also Gnerre v. Massachusetts Commission Against Discrimination, 402 Mass. 502, 507-08 (1988) (sexual harassment, to be actionable, must be sufficiently pervasive to alter the conditions of the victim’s employment). To prevail on this claim, Carozza must show not only that he suffered unsolicited harassment of a sexual nature that made his employment significantly less desirable to him, but also that the harassment “was of such a nature that it would make the plaintiffs [employment] significantly less desirable to a reasonable person in the plaintiffs position.” Gnerre, 402 Mass. at 506-07.
A claim of discrimination through the creation of a hostile work environment, like all other discrimination claims under G.L.c. 151B, must be filed with the MCAD within six months of the alleged discriminatory event or event. G.L.c. 151B, §5; Cuddyer, 434 Mass. at 531. The MCAD regulations interpreting this statute allow an exception to the six-month limitations period when the “unlawful conduct complained of is of a continuing nature.” 804 C.M.R. §1.03 (2); Cuddyer, 434 Mass. at 529 n. 7. While one act might be enough to constitute an actionable claim of sexual harassment, Gnerre, 402 Mass. at 508, a plaintiff claiming a hostile work environment “will often have to establish a continuing violation to recover for otherwise time-barred violations." Cuddyer, 434 Mass. at 532.
“To establish a timely hostile work environment claim of sex discrimination under G.L.c. 151B, a plaintiff must establish that [he] . . . was compelled to work in such an environment during [his] employment. Further, [he] must show, within the six-month limitation period, the existence of at least one incident of sexual conduct which, standing alone might not necessarily support [his] claim, but which substantially relates to earlier incidents of abuse, and substantially contributes to the continuation of a hostile work environment, such that the incident anchors all related incidents, thereby making the entirety of the claim for discriminatory conduct timely.” Id. at 533.
In the case at bar, Carozza’s hostile work environment claim fails on two separate and independent grounds. First, there is no incident of sexual conduct “which substantially relates to earlier incidents of abuse, and substantially contributes to the continuation of a hostile work environment” within six months of December 2, 1997, when he filed his MCAD charge. Indeed, there is no incident of sexual conduct that the plaintiff has alleged occurred after June 2, 1997. The only incident of sexual conduct that even arguably may have occurred on or after this date was the incident in which Carozza’s co-worker, Couglar, discussed his “sexual escapades” with other co-workers in the unit room and Carozza overheard this conversation. In his verified complaint, Carozza attested that this incident occurred in “approximately May and June 1997,” but in his deposition he recalled only that it occurred in 1997 and had no recollection of which month. Therefore, even viewing the evidence in the light most favorable to Carozza, there is not sufficient evidence to permit a finding that this overheard conversation took place on or after June 2, 1997.
Even if this conversation had taken place after June 2, 1997, it would still fall far short of the anchoring event needed for purposes of the statute of limitations, since it cannot reasonably be said substantially to contribute to the continuation of a hostile work environment. When a gay male speaks about sexual matters with other co-workers and that conversation is overheard by the plaintiff, it can hardly be said to constitute an act of sexual harassment. Indeed, there is not even evidence that Couglar spoke in a manner where it was plain he would be overheard by Carozza, since Carozza has no recollection of where Couglar had this conversation within the unit room, or of how far away he was from Carozza.
The only post-June 2, 1997 incidents alleged were McCarty’s comment to Carozza on June 14, 1997 that his personal break should not be included in his overtime hours, and the exchange of words with English on June 24, 1997 that ultimately led to Carozza’s termination. Even if one believed that McCarty made this comment out of resentment for Carozza having spurned McCarty’s alleged sexual advances, this isolated comment cannot reasonably be said to have substantially contributed to the continuation of a hostile work environment. The exchange of words with English and the termination that followed cannot reasonably be said to be substantially related to earlier incidents of alleged sexual harassment. Even Carozza’s version of these events concedes that English confronted him about his supposed use of his laptop while on the clock. Nothing about this incident or the events leading to his termination reasonably can be characterized as sexual harassment.
*94 Nor can Carozza’s allegation that his termination was in retaliation for his complaints about sexual harassment transform the events culminating in his termination into a continuing sexual harassment violation. See Goguen v. Quality Plan Administrators, 11 Mass. L. Rptr. No. 13, 288 (Superior Ct., May 1, 2000) (Gershengorn, J.). A claim of retaliation is separate and distinct from a claim of sexual harassment. In fact, a litigant can prevail on the former even when the latter claim is dismissed. See Bain v. Springfield, 424 Mass. 758 (1997). Since these claims are distinct, conduct that fairly may give rise to a claim of retaliation, but do not constitute acts of discrimination or sexual harassment, cannot be found to have substantially contributed to the continuation of a hostile work environment. These timely acts of alleged retaliation, therefore, cannot anchor (and thereby resurrect) untimely acts of discrimination that had earlier allegedly created a hostile work environment.
Second, even viewing the evidence in the light most favorable to Carozza, there is not sufficient evidence to permit a finding that Carozza’s work environment was so “pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization,” that it made Carozza’s employment significantly less desirable to a reasonable person in his position. See Cuddyer, 434 Mass. at 532; Gnerre, 402 Mass. at 506-07. From Carozza’s testimony, one fairly can infer that he found it to be a hostile work environment, but that does not necessarily permit a reasonable inference that a reasonable person in his position would have found it to be so. When one looks closely at the evidence that Carozza has proffered in support of his claim of a hostile work environment, one finds, as Gertrude Stein said of Oakland, that “there is no there there.”
Certainly, the mere fact that Carozza was one of four heterosexual males in a work unit with 55 employees does not mean that he worked in a hostile environment. Nor would a reasonable person find that environment to be hostile simply because his superiors were women, or because gay fellow employees discussed their sexual experiences and their sexual preferences with other co-workers. Nor do his specific experiences, even when viewed cumulatively and in the light most favorable to him, permit a finding that his work environment was pervaded by harassment or abuse.
When Carozza was told that he was hired because Steve Derose, one of the two persons who interviewed him, liked him, it was not reasonable to infer that Derose was attracted to him sexually simply because Derose was openly gay. There is no evidence that Derose in any way made sexual advances towards Carozza or in any way harassed him.
Carozza may have had trouble dealing with gay sexuality, but that does not mean that his work environment was hostile because female superiors showed him unusual photographs of gay fellow employees.
Nor does it constitute pervasive harassment or abuse for a superior to ask an employee early in his employment to perform minor office errands, such as buying coffee for the unit.
Nor does a single instance of teasing Carozza about his friendship with another heterosexual employee constitute sexual harassment.
Nor is it sexual harassment when a female superior asks a male subordinate to dance at an office party, or puts her hand on his shoulder, or rubs his shoulders at work a few times (and stops when he asks her to).
Nor is it sexual harassment when one’s fellow employees call another an “asshole” or a “sleaze ball.” There is no evidence that Carozza’s fellow employees disliked him because he was male or heterosexual; there is abundant evidence that they disliked him because of his conduct towards them, including his intolerant conduct towards homosexual men.
Carozza may have interpreted these events as pervasive harassment and abuse of him because of his gender and sexual preference, but no reasonable person would have seen it that way. A person does not work in a hostile environment simply because his fellow employees think he is a jerk and treat him that way. Nor is a plaintiff entitled to a trial on a claim of sexual harassment simply by interpreting every instance of touching or fondness as an attempt to initiate a sexual relationship. The fact of the matter is that the evidence in the summary judgment record, even when viewed generously and cumulatively, would not permit any reasonable factfinder to conclude that a reasonable person in Carozza’s position would have considered his fellow employees’ conduct to be pervasive sexual harassment and abuse that made the workplace a hostile environment.
This Court recognizes that Massachusetts courts have been generous on summary judgment to plaintiffs alleging sexual harassment, ánd generally give such plaintiffs the benefit of the doubt when there is a close call as to whether there are genuine issues of material fact. This Court endorses such generosity, believing firmly that courts should provide meaningful recourse to employees who have suffered sexual harassment. However, courts do not truly protect the rights of those sexually harassed by “demeaning the currency” of sexual harassment claims, and allowing any plaintiff alleging sexual harassment to go to trial if he simply characterizes various workplace events as sexual harassment. If courts deny summary judgment on trivial sexual harassment claims, the judiciary will simply assist in trivializing a cause of action that warrants far greater respect.
Therefore, this Court grants summaryjudgment on Carozza’s claim that Blue Cross sexually harassed and *95 discriminated against him on the basis of his gender and sexual orientation in the conditions of his employment through the creation of a hostile work environment. Not only is there no anchoring act of discrimination that occurred within six months of the filing of his charges with the MCAD, but the evidence is also not sufficient to permit a finding of a hostile work environment. In view of the dismissal of the related claim in Count One of quid pro quo gender discrimination regarding his termination, Count One of the Verified Complaint is hereby dismissed in its entirety.
Count II: Retaliation in Violation of G.L.c. 15 IB
Blue Cross has also moved for summary judgment as to Count II of the complaint, which alleges that Carozza’s termination constituted retaliation for his internal complaints about gender discrimination and sexual harassment. To succeed on a claim for retaliation in violation of G.L.c. 151B, Carozza must prove: (1) that he believed in good faith that his employer was engaged in wrongful discrimination; (2) that he acted reasonably in response to his belief; and (3) that the employer’s desire to retaliate against him was a determinative factor in its decision to terminate his employment. Tate v. Dept. of Mental Health, 419 Mass. 356, 364 (1995). There is sufficient evidence for this claim to proceed to trial.
Viewing the evidence in the light most favorable to Carozza, he has presented evidence that he believed in good faith that Blue Cross had wrongfully discriminated against him when he complained to Council about the alleged sexual harassment and told her of the formal sexual harassment complaint he intended to file with “the AG’s office.” His discussion of these concerns with Council was reasonable conduct in response to these beliefs. While Blue Cross vigorously contends that it fired him solely because of his insubordination towards English, there is sufficient evidence, if viewed in the light most favorable to Carozza, to support a finding that Blue Cross sought to retaliate against him for his complaints of sex harassment, that retaliation was a determinative factor in its decision to terminate his employment, and that the reason proffered by Blue Cross for terminating him was simply a pretext. Specifically, there is evidence that:
Carozza told Council about his sexual harassment allegations and his intent to file a formal complaint only eight days before the verbal altercation with English;
Carozza testified that he did not use foul language with English and simply rebuked her for relying on hearsay in making a false accusation against him;
Carozza has furnished evidence that Blue Cross did not terminate employees for the conduct he says he engaged in towards English; a factfinder reasonably may infer that Council's negative evaluation of him played a significant role in the decision to terminate him; and
Carozza has presented evidence that Council based her opinions of him in part on information provided by McCarty, which McCarty denied providing to Council.
This evidence is sufficient to allow the retaliation claim to survive summary judgment.
Count III: Common Law Defamation
Carozza in his Verified Complaint alleges that Blue Cross, through Council, defamed him by making false statements that he was a dangerous person. In fact, Council never specifically called Carozza “dangerous.” Rather, she simply expressed concerns that he maybe dangerous and provided the reasons behind her concerns. She wrote in a memorandum to two of her colleagues in Blue Cross’s human resources department:
. . . I’m concerned about everything I saw when I met with him. This is a VERY angry man, an ex-Marine, looking for a job where he will carry a gun. He has enormous disrespect for women and for his leaders — we had an extensive conversation about that. He has a deeply rigid view of organizations, a devotion to hierarchy and an absolute sense of what is an appropriate business practice, with no room for deviation . . .
When one looks at this portion of the memorandum, it becomes apparent that Carozza’s claim of defamation must fail on two separate and independent grounds:
1. Council’s evaluation of Carozza was privileged because it was reasonably necessary to serve Blue Cross’s legitimate interest in the fitness of one of its employees; see McCone v. New England Telephone & Telegraph, 393 Mass. 231, 235-36 (1984); Bratt v. International Business Machines Corp., 392 Mass. 508, 512-13 (1984); and
2. Council’s expression of concern about Carozza is an opinion that is protected under the First Amendment; Lyons v. Globe Newspaper Co., 415 Mass. 258, 263 (1993); Cole v. Westinghouse Broadcasting Co., Inc., 386 Mass. 303, 308-09, cert. denied, 459 U.S. 1037 (1982).
As to the first ground, it is well established that an employer has a conditional privilege to disclose defamatory information concerning an employee when' the disclosure is reasonably necessary to serve the employer’s legitimate interest in the fitness of an employee to perform his or her job. Bratt, 392 Mass. at 512-13. Here, Blue Cross plainly had a legitimate interest in learning that Carozza appeared to Council to be so angiy that he posed a risk of violence. In view of the number of tragic deaths that have taken place in this Commonwealth in recent years by angry employees, it would be foolish indeed for a court to chill *96 the expression of such concerns about a troubled employee by permitting those concerns to give rise to a claim of defamation. Certainly, this conditional privilege may be abused and lost through reckless conduct resulting in “unnecessary, unreasonable or excessive publication,” or if the statements were made knowing them to be false or with reckless disregard for the truth. Bratt, 392 Mass. at 515-16. But there is no evidence of abuse in this case. Specifically, there is no evidence that the memorandum in question was sent to anyone other than the two human resources recipients, or that Council knew these assertions to be false or recklessly disregarded the truth in expressing her concerns.
As to the second ground, the determination of whether a statement is one of fact or opinion is generally considered a question of law. Cole, 386 Mass. at 309. “In deciding whether statements can be understood reasonably as fact or opinion ‘the test to be applied . . . requires that the court examine the statement in its totality in the context in which it was uttered or published. The court must consider all the words used, not merely a particular phrase or sentence. In addition, the court must give weight to cautionary terms used by the person publishing the statement. Finally, the court must consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published.’ ” Id. at 309, quoting Information Control Corp. v. Genesis One Computer Corp., 611 F.2d 781, 784 (9th Cir. 1980). See also Lyons, 415 Mass. at 263. Here, it is plain that Council is expressing her opinion about the personality and potential propensities of Carozza.
Even if the words were expressions of opinion, they may not be constitutionally protected if the opinion implies the allegation of undisclosed defamatory facts as the basis for the opinion. See, e.g., Lyons, 415 Mass. at 415. In. National Association of Gov't Employees, Inc. v. Central Broadcasting Corp., the Supreme Judicial Court adopted the principles in §566 of the Restatement (Second) of Torts setting forth when the expression of an opinion nonetheless can be actionable in defamation. 379 Mass. 220, 227 (1979), cert. denied, 446 U.S. 935 (1980). The Court declared:
The matter is put thus in Comment C, second part: “A simple expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is. But an expression of opinion that is not based on disclosed or assumed facts and therefore implies that there are undisclosed facts on which the opinion is based, is treated differently.” Thus if I write, without more, that a person is an alcoholic, I may well have committed a libel prima facie; but it is otherwise if I write that I saw the person take a martini at lunch and accordingly state that he is an alcoholic . . .
Id. at 227-28 (footnotes omitted). The rationale is that, when an opinion is accompanied by factual statements, it is understood by the listener that the opinion is based on those factual statements; if false, those factual statements may be actionable in defamation but the opinion cannot be, no matter how unjustified and derogatory it may be. Cole, 386 Mass.at 313; Restatement (Second) of Torts, §566, comment c. Here, Council provided the factual statements that underlay her concerns, and there is no allegation that those factual statements were themselves false.
There is one other means by which this Court can be certain that Council’s words constitute protected opinion — by their very nature, they cannot be proven to be false and “(a]n assertion that cannot be proved false cannot be held libelous.” Cole, 386 Mass. at 312, quoting Hotchner v. Castillo-Puche, 551 F.2d 910, 913 (2nd Cir.), cert. denied sub nom Hotchner v. Doubleday & Co., 434 U.S. 834 (1977). See also Ward v. Zelikovsky, 643 A.2d at 979 (“The significance of opinion/fact and non-fact/fact distinctions centers on the concept of verifiability. Requiring that a statement be verifiable ensures that defendants are not punished for exercising their First Amendment right to express their thoughts.”).
For all these reasons, summary judgment must be allowed as to the claim of defamation.
ORDER
For the reasons detailed above, this Court ORDERS that defendant’s motion for summary judgment is DENIED with respect to Count II (retaliation) and ALLOWED with respect to Count I (gender discrimination and sexual harassment) and Count III (defamation).

 Although the complaint alleges four separate claims, there are only three counts. Count I alleges both the hostile work environment claim and the claim that he was terminated for refusing his supervisor’s sexual advances.

 The “Certificate” states: “In Recognition of Your Obnoxious Attitude, Ability to Piss People Off, Complete Asinine Juvenile Behavior, and Total Dedication to Personal Gain Without Regard to the Many Hardships You Have Forced Upon Friends, Family and Others During Your Lifetime, You Have Become a Legend in YOUR Own Mind. To Recognize Your Upgrade From Half-Assed to Complete Asshole Gives All Concerned Great Satisfaction. If Anyone, For Any Reason, Doubts Your Status, JUST BE YOURSELF!”

 In Carozza's complaint, he alleged that Arlene’s criticism of him preceded Couglar’s grabbing of his crotch. However, in his deposition, he testified that Couglar’s conduct came first.

 Carozza is unable to provide specific dates or even a general time period for these alleged incidents.

 There is evidence in the record that Carozza wished eventually to obtain a job in law enforcement and that Blue Cross, or at least Council, was aware of his aspirations.

 It should be noted that this claim could not survive summary judgment even if the traditional fourth element of the prima facie case were appropriate here and had been relied on by the Court. There is no evidence in the summary judgment record as to whom, if anyone, performed Carozza’s duties after his termination. Therefore, Carozza has failed to meet his burden as to this traditional fourth element of the prima facie case.